912 So.2d 204 (2005)
BIRMINGHAM-JEFFERSON CIVIC CENTER AUTHORITY et al.
v.
CITY OF BIRMINGHAM; Taxpayers and Citizens of the City of Birmingham; and Jefferson County.
1031522.
Supreme Court of Alabama.
May 3, 2005.
*205 R. Preston Bolt, Jr., and E. Luckett Robinson II of Hand Arendall, L.L.C., Mobile; E. Shane Black of Hand Arendall, L.L.C., Birmingham; and Thomas L. Stewart of Emond, Vines, Gorham & Waldrep, Birmingham, for appellant Birmingham-Jefferson Civic Center Authority.
Troy King, atty. gen., and Billington M. Garrett and Alice M. Maples, asst. attys. gen., for intervenor/appellant State of Alabama.
Oakley Melton, Jr., and J. Flynn Mozingo of Melton, Espy & Williams, P.C., Montgomery, for intervenors/appellants Alabama House of Representatives, Alabama Senate, and Alabama Legislative Officials.
Edwin A. Strickland, county atty., and Jeffrey M. Sewell, Birmingham, for appellee Jefferson County.
Tamara Harris Johnson, city atty., and Patricia Cole Burns, James C. Stanley, and Rowena Teague, Birmingham, for appellee City of Birmingham.
Frank M. Caprio of Bradley Arant Rose & White, LLP, Huntsville, for amicus curiae Alabama Space Science Exhibit Commission, in support of the appellants.
SEE, Justice.[1]
The Birmingham-Jefferson Civic Center Authority ("the Authority"), the State of Alabama, the Alabama House of Representatives, the Alabama Senate, and certain officials of the House of Representatives and the Senate appeal from an order of the Jefferson Circuit Court declaring unconstitutional two acts passed by the Alabama Legislature. We hold that this case presents a nonjusticiable political question reserved to the legislature by the separation-of-powers doctrine embodied in the Constitution of Alabama of 1901. Therefore, the trial court should have declined to decide the question. We vacate the trial court's judgment and dismiss the appeal.

Facts and Procedural History
The Authority is a public corporation authorized by Amendment No. 238 and Amendment No. 280 to the Constitution of Alabama of 1901. Those amendments authorized the Authority to issue bonds or other evidences of indebtedness and to pledge various funds for the payment of that debt. Amendment No. 280 "validated and confirmed" previous legislation that had empowered the Authority to "construct, *206 maintain, control, operate and manage a civic center in the county seat" of Jefferson County. See Act No. 547, Ala. Acts 1965. Amendment No. 280 also "validated and confirmed" those acts of the legislature that provide for the funding of the Authority through county-wide cigarette, lodging, and sales and use taxes in addition to those previously levied by the State. See Act No. 524 and Act No. 525, Ala. Acts 1965, and Act No. 405, Ala. Acts 1967. Amendment No. 280 also provides:
"No tax levied by the state or any municipality or county of the state shall apply to [the Authority], unless such tax applies to the county and the city wherein the [Authority] is located."
In 2001, the legislature passed Act No. 2001-545, Ala. Acts 2001, applicable to Jefferson County only, which imposed a "three percent sales tax on alcoholic beverages sold from restaurants that are licensed by the Alcoholic Beverage Control Board." The proceeds from this particular tax would be allocated to the Authority and used to support the operation of the Authority, "including, but not limited to, capital expansion, renovation, and maintenance." In June 2003, the legislature passed Act No. 2003-288, Ala. Acts 2003 ("Act No. 288"). Act No. 288 specifically amended Section 9 of Act No. 2001-545 to provide that the tax imposed by it became operative "on the first day of the third calendar month following passage of this act and approval of this act by the Governor, or this act's otherwise becoming law."[2]
Also in June 2003, the legislature passed Act No. 2003-357, Ala. Acts 2003 ("Act No. 357"), amending Act No. 547 and declaring as part of its legislative findings that Amendment No. 280 in fact exempted the Authority from imposing and paying various taxes. Act No. 357 specifically empowered the Authority to impose and collect fees or charges in lieu of those taxes and to retain and use those fees or charges for any lawful purpose. In other words, the legislature empowered the Authority to withhold tax revenue previously paid over to the City of Birmingham ("the City") or Jefferson County ("the County") and to keep the fees or charges it imposed in lieu of the taxes for its own uses.
Beginning on or around the date Act No. 288 and Act No. 357 were approved, the Authority stopped paying taxes previously due to be paid to the City and the County and withheld that revenue as fees and charges to be used for its own corporate purposes. The City petitioned the Jefferson Circuit Court for a judgment declaring Act No. 357 "unconstitutional, null, void and unenforceable" and directing the Authority to pay over as taxes due and payable to the City all sums the Authority had collected as fees or charges in lieu of those taxes.
On January 27, 2004, the Authority petitioned the Jefferson Circuit Court, pursuant to Ala.Code 1975, § 6-6-750 et seq.,[3] *207 seeking to validate the proposed issue of $1 million in bonds to renovate the Birmingham-Jefferson Civic Center.[4] The Authority moved the trial court to consolidate the City's declaratory-judgment action with the Authority's bond-validation action. The trial court granted the motion and consolidated the cases.
The County was permitted to intervene. The County's complaint, like the City's, alleges that Act No. 357 induced the Authority improperly to hold onto tax revenues the County claims rightfully belong to it and that Act No. 357 is unconstitutional and therefore void. The County further alleges that Act No. 288, which requires the County's revenue department to collect an alcoholic beverage tax and to remit those tax revenues to the Authority, is similarly unconstitutional.
Section 61, Ala. Const.1901, provides that "[n]o law shall be passed except by bill"; § 63 provides:
"Every bill shall be read on three different days in each house, and no bill shall become a law, unless on its final passage it be read at length, and the vote be taken by yeas and nays, the names of the members voting for and against the same be entered upon the journals, and a majority of each house be recorded thereon as voting in its favor, except as otherwise provided in this Constitution."
The City and the County argue that the term "house" in the phrase "a majority of each house" in § 63 means a quorum of that house, and they allege that neither Act No. 288 nor Act No. 357 was passed by a majority of a quorum of the House of Representatives.
The legislature is made up of two houses: the House of Representatives and the Senate. The House of Representatives is composed of 105 members and the Senate of 35. Section 52, Ala. Const.1901, provides that in order for each house to do business, a quorum, that is, a majority of the members, must be present. A quorum of the House of Representatives is 53 members; a quorum of the Senate is 18 members. The City and the County contend that the word "house" as used in § 63 actually means a quorum of the house and that a bill must receive a minimum of 27 favorable votes (a majority of the quorum of 53) in the House of Representatives in order to become law.
The City and the County argue that the House of Representatives did not properly pass Act No. 288 and Act No. 357 in accordance with § 63. On June 9, 2003, House Bill 769, which became Act No. 288, was introduced and given its first reading, and it was read again on each of two *208 different days. On June 11, 2003, the date of the bill's third reading, the House of Representatives convened; 101 of its 105 members were present, thus constituting a quorum. House Bill 769 received 21 yea votes, 4 nay votes, and 55 abstentions; House Bill 769 was delivered to the Senate, where it was read three times and, on June 16, passed by a vote of 23 yea votes, 0 nay votes, and 3 abstentions. The bill was then returned to the House of Representatives and delivered to and signed by the Governor. House Bill 769 was then enrolled as Act No. 2003-288, Ala. Acts 2003.
Act No. 357 has a similar history. On June 9, 2003, House Bill 768, which became Act No. 357, was introduced and received its first reading; it was read again on each of two different days. On June 11, 2003, as noted above, the House convened with 101 of 105 members present. House Bill 768 received 18 yea votes, 4 nay votes, and 53 abstentions; House Bill 768 was delivered to the Senate where it was read three times, and on June 16, it was passed by a vote of 22 yea votes, 0 nay votes, and 3 abstentions. The bill was then returned to the House of Representatives and delivered to and signed by the Governor. House Bill 768 was then enrolled as Act No. 2003-357, Ala. Acts 2003.
The Authority argues that the proper question is not whether 27 members of the House of Representatives, a majority of a quorum, voted in favor of the bills that became Act No. 288 and Act No. 357, but whether the bills received a favorable majority of the yea and nay votes cast in the presence of a quorum. Because both House Bill 769 and House Bill 768 received a majority of the yea and nay votes cast on those bills in the House of Representatives, the Authority argues, Act No. 288 and Act No. 357 were lawfully enacted.
It is undisputed that for at least 30 years the legislature has interpreted § 63 to mean that when a quorum is present and a bill receives a favorable majority of those votes cast for and against it, then that bill has passed that house of the legislature. Legislators other than those who vote yea or nay are present in the chamber during such votes; some of those affirmatively abstain from voting and some of those take no action whatever. As a result of this practice, many bills pass with only a handful of affirmative votes, few or no opposing votes, and a large number of members either abstaining or taking no action. This practice was undisputedly employed in the enactment of Act No. 288 and Act No. 357.
The trial court agreed with the City and the County's interpretation of § 63 and ruled that the requirement in § 63 that a "majority of each house" cast a favorable vote means a majority of a quorum, which in the House of Representatives would mean that at least 27 members must vote affirmatively on a bill for it to pass. The trial court noted that Act No. 288 received 21 yea votes in the House, 6 votes short of the minimum number needed for passage, and that Act No. 357 received 18 yea votes in the House, 9 votes short of the minimum number needed for passage. Consequently, the trial court held that both acts failed to meet the constitutional requirement for becoming law, and are therefore void.
The Authority filed a motion to modify the trial court's order and sought to impose a stay. The trial court reconsidered its order "for the limited purpose of permitting the parties to submit additional evidence and legal authority for the record [in] this case." The Authority was granted a stay while the case was pending; it was not required to remit to the City and the County the fees and charges it had collected *209 in lieu of taxes. The Authority was, however, required to place all such fees and charges in escrow until the case was resolved.
The legislature and certain officials of the legislature (hereinafter referred to collectively as "the Legislature") moved to intervene of right, pursuant to Rule 24(a)(2), Ala. R. Civ. P., arguing that they have an interest distinct from that of the other parties to the litigation. All parties acquiesced in their intervention. The Legislature filed a brief with the trial court, arguing that the bills that became Act No. 288 and Act No. 357 were properly passed and that Act No. 288 and Act No. 357 were properly enacted. The Legislature's brief to the trial court included as attachments the affidavits of several current and former members and officials of the Alabama Legislature, specifically: Albert P. Brewer, a former member of the House of Representatives, a former speaker of the House, a former lieutenant governor, a former governor, and presently a law professor; McDowell Lee, secretary of the Senate and a former member of the House; Greg Pappas, clerk of the House of Representatives; Robert L. McCurley, who since 1975 has been the director of the Alabama Law Institute, which publishes The Legislative Process, A Handbook for Alabama Legislators; Jack Venable, who since 1974 has been a member of the House of Representatives and who is chairman of the House Rules Committee; and Jerry L. Bassett, director of Alabama Legislative Reference Service and the state Code commissioner. All the affiants state their opinion, based upon their experience, research, and/or personal knowledge, that it has been a long-standing practice of the legislature to deem a bill passed when it receives a majority of the votes cast in the presence of a quorum, in accordance with § 63, Ala. Const.1901.
During the 2004 session of the legislature, the legislature passed House Bill 814, which became Act No. 2004-531, Ala. Acts 2004 ("Act No. 531"), which purported to "validate[ ] and confirm[ ]" all previous legislation passed by the House concerning the Authority. Act No. 288 and Act No. 357 are included in the list of acts purportedly validated by the enactment of Act No. 531. On May 4, 2004, the date of the third reading of House Bill 814, the House convened with 102 of its 105 members present; thus, a quorum was present. House Bill 814 received 39 yea votes, 0 nay votes, and 8 abstentions. The bill was delivered to the Senate, where it passed by a clear majority vote. The bill was returned to the House, which then delivered it to the Governor for his signature, which was affixed on May 17. House Bill 814 then became known as Act No. 2004-531, Ala. Acts 2004. The City and the County amended their complaints and requested that the trial court also declare Act No. 531 unconstitutional.

The Trial Court's Final Order
The trial court conducted a hearing at which all parties were present on all three challenged acts  Act No. 288, Act No. 357, and the "validating" Act No. 531 enacted by the legislature in 2004. On June 28, 2004, the trial court entered its order. The court noted that the issue before it was narrowly defined: whether, as the City and the County argued, a bill must receive the affirmative vote of a majority of a quorum, or whether, as the Authority and the Legislature argued, a bill must receive only the affirmative vote of a majority of the yea and nay votes cast in the presence of a quorum. Recognizing that "[t]here is every presumption in favor of the validity of legislation," the trial court also acknowledged the power vested in courts "at least since Marbury v. Madison [, 5 U.S. (1 Cranch) 137 (1803),] ... to *210 decide all questions regarding the constitutionality of statutes." Looking to the Alabama Constitutional Convention of 1901, the trial court determined that the evidence from that convention indicated that a "majority of each house," as that phrase is used in § 63, means a majority of a quorum. The trial court cited cases in which this Court has addressed the meaning of the phrase "majority of each house," such as State ex rel. Woodward v. Skeggs, 154 Ala. 249, 46 So. 268 (1908), Farmers' Union Warehouse Co. v. McIntosh, 1 Ala.App. 407, 56 So. 102 (1911), and Opinion of the Justices No. 30, 228 Ala. 140, 152 So. 901 (1934), and concluded that those cases supported the position advanced by the City and the County.
The trial court considered rules employed by the legislature and concluded that the rules cited in support of the position advanced by the Authority and the Legislature actually deal not with the issue before it but with the limited question of what constitutes a quorum. The trial court then considered a common-law voting rule that supports the Authority's position and concluded that the common-law rule applies to decisions "made in elections and in business proceedings rather than in legislatures." Finally, the trial court considered the fact that the legislature has employed its voting practice for many years, as a matter of "local legislative courtesy."[5] The trial court stated that the framers of the Alabama Constitution of 1901 intended to remove power from the counties and to vest it in Montgomery. Therefore, the trial court concluded, the practice of "local legislative courtesy" was not constitutionally sanctioned, and, thus, could not support the interpretation of § 63 advanced by the Authority and the Legislature.
The trial court then addressed Act No. 531, the attempted validation legislation. The trial court noted that House Bill 814, the bill that became Act No. 531, received 39 affirmative votes and 8 abstentions in the House, but that there were 102 members present in the House. Thus, the trial court concluded, House Bill 814 would have had to have received a majority of that number, or 52 votes, in order to pass the House, and it did not. Therefore, the trial court concluded, Act No. 531 is also void. Confronting the implication that its order could potentially affect hundreds or thousands of local legislative acts, and despite its previous references to Act No. 531, the trial court stated that it was ruling only on the validity of Act No. 288 and Act No. 357, not on the validity of Act No. 531 or any other act: "If there are consequences to other bills not before this Court, the appellate courts have the power to fashion an appropriate and practical remedy to lessen the impact upon existing law."
The trial court held that the requirement of § 63 that a bill pass by a favorable vote of "a majority of each house" means that a bill must receive a favorable vote of "a majority of a quorum." Because there are 105 members of the House, a quorum is 53 members. Because a majority of 53 is 27, the trial court held that a bill must receive at least 27 votes in the House in order to pass. Because the bills that became Act No. 288 and Act No. 357 each received fewer than 27 votes, the trial court declared them unconstitutional. The trial court ordered the Authority to continue *211 to collect fees and charges in lieu of taxes and to place them in escrow pending a final disposition of the case. The trial court certified its order for interlocutory appeal under Rule 5, Ala. R.App. P.
The Authority, along with the Legislature and the State, petitioned this Court for permission to appeal under Rule 5, Ala. R.App. P. This Court granted the petition and held oral argument on this case on March 1, 2005.

Discussion
Section 63, Ala. Const. 1901, reads, in pertinent part:
"[N]o bill shall become a law, unless on its final passage it be read at length, and the vote be taken by yeas and nays, the names of the members voting for and against the same be entered upon the journals, and a majority of each house be recorded thereon as voting in its favor, except as otherwise provided in this Constitution."
Because some members of the legislature who are present may abstain or may simply not vote on a bill, even with a quorum present a bill can receive an affirmative majority of the total number of votes cast for and against it, yet fail to receive the affirmative vote of a majority of those legislators who constitute the quorum. The legislature has interpreted § 63 to mean that when a quorum is present and a bill receives a favorable majority of those votes cast for and against it, then the bill has passed that house of the legislature.
This interpretation of § 63 is reflected in the rules and practice of the legislature. House Rule 93 provides that any matter not specifically addressed by the rules of the House shall be governed by Mason's Manual of Legislative Procedure (1989 ed.). With respect to voting procedure, the House adheres to § 510 of Mason's Manual, which provides:
"A majority of the legal votes cast, a quorum being present, is sufficient to carry a proposition unless a larger vote is required by a constitution, charter, or controlling provision of law. Members present but not voting are disregarded in determining whether an action carried."[6]
It is undisputed that for at least 30 years the legislature's interpretation of § 63 has been consistently applied as the parliamentary practice of the Alabama House of Representatives.[7]
During the 2003 Regular Session, in the presence of a quorum, the Alabama House of Representatives passed the bill that became Act No. 288 by a vote of 21 yeas, 4 nays, and 55 abstentions, and it passed the bill that became Act No. 357 in the presence of a quorum by a vote of 18 yeas, 4 nays, and 53 abstentions. Because the *212 bills that became Act No. 288 and Act No. 357 received a favorable majority of the yea and nay votes cast in the presence of a quorum in the House of Representatives, consistent with its long-standing interpretation of § 63 the House of Representatives considered the bills passed. The bills were then forwarded to and passed by the Senate. The enrolled bills were signed by the Speaker of the House and the Lieutenant Governor, as the presiding officer of the Senate, pursuant to § 66 of the Constitution of Alabama,[8] and delivered to the Governor, who approved the bills and signed them into law.
The trial court declared Act No. 288 and Act No. 357 unconstitutional not because they were passed in a manner contrary to the rules or standard practice of the legislature, but because, the trial court held, the rules and practice of the legislature do not conform to the Constitution of Alabama. The trial court effectively declared that the legislature's manner of conducting its own business is, in this regard, unconstitutional.
The Constitution of Alabama expressly adopts the doctrine of separation of powers that is only implicit in the Constitution of the United States. Opinion of the Justices No. 380, 892 So.2d 332, 334 n. 1 (Ala.2004). This Court has said that the Alabama Constitution provides that the "three principal powers of government shall be exercised by separate departments," and it "expressly vest[s] the three great powers of government in three separate branches." Ex parte Jenkins, 723 So.2d 649, 653-54 (Ala.1998). Section 42, Ala. Const.1901, provides:
"The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."
Section 43 provides:
"In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men."
"`Great care must be exercised by the courts not to usurp the functions of other departments of government. § 43, Constitution 1901. No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary.'" Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 911 (Ala.1992) (quoting Finch v. State, 271 Ala. 499, 503, 124 So.2d 825, 829 (1960)). Thus, just as this Court will declare legislative usurpation of the judicial power violative of the separation-of-powers provision of our Constitution, see, e.g., Ex parte Jenkins, supra, so it must decline to exercise the judicial power when to do so would infringe upon the exercise of the legislative power.
The separation-of-powers provision of the Alabama Constitution limits the jurisdiction of this Court. In Ex parte James, 836 So.2d 813, 815 (Ala.2002), the "Equity Funding Case," this Court considered the justiciability of the question of the constitutionality of the State's method of *213 funding the public-school system. After issuing four opinions over the course of nine years, we were finally compelled by the mandate of § 43 to dismiss the Equity Funding Case.[9] We dismissed the Equity Funding Case because the judicial branch of government must "`never exercise the legislative and executive powers, or either of them.'" 836 So.2d at 819 (quoting Ala. Const.1901, § 43). By finally dismissing the Equity Funding Case as nonjusticiable, we "retreat[ed]" from the "province of the legislative branch" and "return[ed] the Equity Funding Case in toto to its proper forum"  the legislature. 836 So.2d at 819.
None of the parties to this case has argued that the issue before us is nonjusticiable; however, questions regarding jurisdiction, that is, questions of the constitutional authority of the courts to exercise power over a matter  going to the very core of the Constitution's structuring the government to constrain its exercise of power  are of such importance that it is the duty of this Court to consider the absence of jurisdiction on our own initiative. See Baldwin County v. Bay Minette, 854 So.2d 42 (Ala.2003). The oath of office taken by the Justices on this Court to "support the Constitution of the State of Alabama" requires us to consider whether this Court has jurisdiction over a particular matter.[10]See § 279, Ala. Const. 1901.
*214 Because the judicial branch "shall never exercise the legislative and executive powers, or either of them," this Court will not decide "political questions," even if submitted to it.[11] The Supreme Court of the United States has with some frequency addressed whether certain issues are nonjusticiable political questions.[12] We have previously referred to the United States Supreme Court's formulation of what constitutes a nonjusticiable political question, and we look to it again in this case.[13]See, e.g., Ex parte James, 836 So.2d 813, 842 n. 25; Ex parte James, 713 So.2d 869, 903; State ex rel. James v. Reed, 364 So.2d 303, 305 (Ala.1978). In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court of the United States offered the following description:
"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the *215 impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."
369 U.S. at 217, 82 S.Ct. 691.[14] The presence of one or more of the factors listed in Baker v. Carr indicates that a question is "political," that is, one reserved for, or more suitably determined by, one of the political branches of government. If a question is one properly to be decided by the executive or legislative branch of government, rather than by the judicial branch, we will not decide it. At least three of the factors enunciated in Baker v. Carr are present in this case.

1. Textually demonstrable constitutional commitment of the issue to a coordinate political department.
In Nixon v. United States, 506 U.S. 224, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993), a former chief judge of the United States District Court for the Southern District of Mississippi, Judge Walter L. Nixon, was impeached by the United States House of Representatives and was convicted by the Senate. Nixon argued that Senate Rule XI, under which he was tried and convicted, was unconstitutional because it provided for a Senate committee, rather than for the full Senate, to participate in the evidentiary hearings.
The first sentence of the Impeachment Trial Clause, Art. I, § 3, cl. 7, United States Constitution, states that "[t]he senate shall have the sole power to try all impeachments." The Supreme Court affirmed the lower court's ruling that the matter is nonjusticiable, holding that the language of the Impeachment Trial Clause demonstrates a commitment of the matter of impeachments to the Senate. The Supreme Court explained that in order to determine whether there is a textually demonstrable constitutional commitment of an issue to a coordinate political department, a court must, in the first instance, interpret the text in question and determine to what extent the issue is textually committed. 506 U.S. at 228, 113 S.Ct. 732 (citing Powell v. McCormack, 395 U.S. 486, 519, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). The Supreme Court concluded that the first sentence of the Impeachment Trial Clause is a grant of authority to the Senate and that the word "sole" indicates that the authority is reposed in the Senate and nowhere else. 506 U.S. at 229, 113 S.Ct. 732. The Supreme Court was unpersuaded by Nixon's argument that "sole" means merely that the Senate, as opposed to the *216 courts or a lay jury or a Senate committee, may try impeachments. The Supreme Court, quoting Webster's Third New International Dictionary (1971), noted that "sole" is defined as "`functioning ... independently and without assistance or interference,'" 506 U.S. at 231, 113 S.Ct. 732, and that allowing judicial review of impeachments would be inconsistent with the use of the word "sole." The Court held, therefore, that the use of the word "sole" in the Impeachment Trial Clause means that the Senate's impeachment power is not subject to judicial review.[15]
The Supreme Court's distinguishing of Nixon from Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), is instructive. In Powell, the Supreme Court had examined the issue whether the constitutional commitment to the House of Representatives of the authority to judge the qualifications of its members precluded judicial review of such a determination. Article I, § 5, provides: "Each House shall be the judge of the elections, returns and qualifications of its own members." However, Art. I, § 2, specifies three requirements for membership in the House: a member of the House must have attained the age of 25 years, must have been a citizen of the United States for 7 years, and must be an inhabitant of the state from which he is elected. In Powell, the Supreme Court held that those three specific requirements impart to the word "qualifications" in Art. I, § 5, "a precise, limited nature." 395 U.S. at 522, 89 S.Ct. 1944. Thus, the House's argument that its power to judge the qualifications of its own members is a textually demonstrable commitment of unreviewable authority is "defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership." Nixon, 506 U.S. at 237, 113 S.Ct. 732 (discussing Powell).
In Nixon, on the other hand, there is no separate provision of the Constitution that would be defeated by allowing the Senate final authority to determine the meaning of the word "try" in the Impeachment Trial Clause. 506 U.S. at 237-38, 113 S.Ct. 732. The Supreme Court in Nixon recognized that, although courts do possess the power to review legislative or executive actions that transgress identifiable textual limits, the word "try" in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority committed to the Senate to conduct impeachment proceedings. Id. Thus, the Supreme Court concluded, the question of how the Senate may "try" an impeachment is a nonjusticiable political question.
In State of Alabama ex rel. James v. Reed, 364 So.2d 303 (Ala.1978), this Court considered whether the question of a legislator's ability to hold office is nonjusticiable because it is committed to the legislature by the text of the Alabama Constitution. The State brought a quo warranto action challenging the qualifications of Thomas Reed to hold office as a member of the Alabama House of Representatives. Reed had been previously convicted of attempted bribery. This Court recognized that if the authority to pass on the question of Reed's eligibility *217 is vested exclusively in the House of Representatives, then the question presented is a political one barred from judicial resolution by the separation-of-powers doctrine. 364 So.2d at 305. Reed contended that §§ 51 and 53, Ala. Const. 1901, are a textually demonstrable constitutional commitment of the issue of a House member's eligibility to the legislature and, therefore, that the question is nonjusticiable. Section 51 provides: "Each house shall choose its own officers and shall judge the election, returns, and qualifications of its members." Section 53 provides: "Each house shall have power to determine the rules of its proceedings...."
This Court determined in Reed that §§ 51 and 53 do not demonstrate a constitutional commitment of the issue to the legislature. However, the holding expressly rested on the presence of § 60, Ala. Const. 1901, which provides that "[n]o person convicted of embezzlement of the public money, bribery, perjury, or other infamous crime, shall be eligible to the legislature, or capable of holding any office of trust or profit in this state." This Court held that § 60 is a specific constitutional limitation on legislative authority,[16] like the three requirements for membership in the United States House of Representatives the Supreme Court of the United States considered in Powell v. McCormack. Because § 60 expressly limits legislative authority, this Court concluded, judicial enforcement of its mandate does not "derogate the principle of separation of powers." 364 So.2d at 306. This Court concluded that to construe §§ 51 and 53 as vesting in the legislature exclusive authority on the issue, thereby removing it from judicial cognizance, would deprive § 60 of its field of operation. 364 So.2d at 306-07.
Section 63, Ala. Const. 1901, states that "no bill shall become a law, unless ... a majority of each house be recorded [upon the journals] as voting in its favor." The question presented in the case before us today is whether the rules and procedure by which the Alabama House of Representatives determined that the bills that became Act No. 288 and Act No. 357 each received a majority vote of the House are subject to judicial review. Section 53, Ala. Const.1901, expressly provides that "[e]ach house shall have power to determine the rules of its proceedings." The power of the legislature to determine the rules of its own proceedings is "unlimited except as controlled by other provisions of our Constitution," and "unless controlled by other constitutional provisions the courts cannot look to the wisdom or folly, the advantages or disadvantages of the rules which a legislative body adopts to govern its own proceedings." Opinion of the Justices No. 185, 278 Ala. 522, 524-25, 179 So.2d 155, 158 (1965).
Unlike Reed, in which an express constitutional prohibition on a felon's serving in the legislature was applicable, and unlike Powell, in which express constitutionally identified qualifications for membership in the United States House of Representatives were applicable, there is in the case before us no provision of the Alabama Constitution that defines or limits what is meant by the term "a majority of each house," and there is no other provision of the Constitution that would be defeated by allowing the legislature the final authority over its internal voting rules and procedures. *218 Because the Alabama Constitution contains no limitation on the manner in which the legislature might interpret the phrase "majority of each house" and because the Constitution clearly grants to the legislature the power to determine the rules of its own proceedings, whether a "majority of each house" has voted in favor of a bill must be decided by the rules established by the legislature. We conclude that there is a textually demonstrable constitutional commitment to the legislature of the question of how to determine what constitutes a "majority of each house... voting in [the bill's] favor." See Nixon, 506 U.S. at 230, 113 S.Ct. 732. Therefore, whether the legislature conducted its internal voting proceedings in compliance with § 63 is a nonjusticiable issue.

2. Lack of judicially discoverable and manageable standards for resolving question.
"[J]udicial action must be governed by standard, by rule. Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions." Vieth v. Jubelirer, 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (discussing the "lack of judicially discoverable and manageable standards" factor enunciated in Baker v. Carr).
In Nixon v. United States, Nixon argued that his challenge to the constitutionality of Senate Rule XI was justiciable and that the word "try" in the Impeachment Trial Clause imposes a constitutional requirement that an impeachment proceeding be in the nature of a judicial trial. The Supreme Court of the United States held, however, that a variety of definitions could be assigned to the word "try" and that, therefore, the term lacks sufficient precision to afford a "judicially discoverable and manageable standard[]" for the judiciary to apply in reviewing the legislative action. 506 U.S. at 230, 113 S.Ct. 732. The Supreme Court addressed the lack of a judicially discoverable and manageable standard for review together with its consideration of the textually demonstrable commitment of the matter to the legislative branch of government. It held that the lack of a judicially discoverable and manageable standard strengthened the conclusion that there had been a textually demonstrable commitment of the question to a coordinate branch of the government, and that the question was, therefore, nonjusticiable.[17]
Although this Court did not speak in terms of judicially discoverable and manageable standards in Reed, supra, the determination that the question presented in that case was justiciable rested on the existence of a separate constitutional provision limiting the authority of the legislature in determining the eligibility of its members. The specific limitation of § 60 as to who could serve in the legislature provided the Court with a judicially discoverable and manageable standard for its review of the issue.
The Constitution of Alabama, the only source of any limitation on the authority of the legislature, offers no such standard by which the judicial branch of the government can review the legislature's voting rules and procedures with respect to the *219 legislature's determination that "a majority of each house" voted in favor of the bills that became Act No. 288 and Act No. 357.[18] The Constitution does not define the term "majority of each house," and the legislature's power to determine its rules regarding voting procedures is not limited by the text of the Constitution. Therefore, there is no manageable standard this Court can discover to guide our review of the legislative action at issue in this case. Because of the lack of judicially discoverable and manageable standards for resolving the question presented to us, we decline to decide it.

3. Lack of the respect due coordinate branches of government.
"The preservation of the constitution in its integrity and obedience to its mandates, is exacted alike from the legislative and the judicial departments of the government." Mayor of Mobile v. Stonewall Ins. Co., 53 Ala. 570, 575 (1875). Legislators take the same oath of office that judges and justices take  to "support the Constitution of the United States, and Constitution of the State of Alabama." See § 279, Ala. Const. 1901. The Constitution provides that "[e]ach house [of the legislature] shall have power to determine the rules of its own proceedings," and the judiciary should presume that the legislators comply with their oath of office when they determine and apply those rules. If the judiciary questions the legislature's declaration that Act No. 288 and Act No. 357 were validly enacted by the legislature, we would be demonstrating a lack of the respect due that coordinate branch of government.
In Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), The Tariff Act of October 1, 1890, was challenged as not being a law of the United States.[19] The *220 Supreme Court of the United States stated:
"The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept, as having passed Congress, all bills authenticated in the manner stated: leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution."
143 U.S. at 672, 12 S.Ct. 495 (emphasis added). The Supreme Court noted the uncertainty and instability that would result if every person were free to "`hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not.'" 143 U.S. at 677, 12 S.Ct. 495 (quoting Weeks v. Smith, 81 Me. 538, 547, 18 A. 325, 327 (1889)).
We are here presented with a similar situation. In Baker v. Carr, the Supreme Court of the United States stated that the appropriateness of attributing finality to an action of one of the political departments is a "dominant consideration" in determining whether a question falls within the political-question category. 369 U.S. at 210, 82 S.Ct. 691. We, like the United States Supreme Court in Field v. Clark, are persuaded that uncertainty and instability would result if every person were free to "hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not," 143 U.S. at 677, 12 S.Ct. 495 (quoting Weeks v. Smith, 81 Me. at 547, 18 A. at 327), and the internal proceedings of the *221 legislature when passing a bill were to be subject to judicial challenge.
The Supreme Court of the United States has explained that the language of Field v. Clark quoted above does not apply in the presence of a clear constitutional requirement that binds Congress. United States v. Munoz-Flores, 495 U.S. 385, 392 n. 4, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990). In Munoz-Flores, the Supreme Court of the United States was presented with a challenge to a revenue-raising act alleged not to have originated in the House of Representatives, as required by Art. I, § 7, cl. 1, of the Constitution of the United States. In Field v. Clark, the Supreme Court had held that courts should not question an authentication by Congress that a bill has passed; that authentication "should be deemed complete and unimpeachable." 143 U.S. at 672, 12 S.Ct. 495. However, the Origination Clause at issue in Munoz-Flores specifically mandates that all revenue-raising bills originate in the House,[20] and there is no question as to the meaning of the constitutional requirement that "[a]ll Bills for raising revenue shall originate in the House of Representatives." We are not here presented with such a situation.
In the case before us today, there is no clear constitutional provision binding the legislature to a certain manner of determining whether a "majority of each house" has voted in favor of a bill. Thus, the rationale of Field v. Clark is applicable, and the judiciary should not question the determination by the legislative branch of whether a bill was passed by the requisite majority vote of the house. To do so would be to demonstrate a lack of the respect due a coordinate branch of government. As Justice Scalia says in his concurrence in Munoz-Flores:
"Mutual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding such matters of internal process be accepted at face value."
495 U.S. at 410, 110 S.Ct. 1964 (Scalia, J., concurring in the judgment).
Because judicial review of the issue whether the bills that became Act No. 288 and Act No. 357 received the favorable vote of a "majority of each house" would express a lack of the respect due that coordinate branch of government, the question presented is nonjusticiable. We, therefore, decline to decide it.

Conclusion
Section 53, Ala. Const. 1901, specifically commits to each house of the legislature the "power to determine the rules of its own proceedings." Our Constitution contains no identifiable textual limitation on the legislature's authority with respect to voting procedures that would permit judicial review of those procedures. There is also a lack of judicially discoverable and manageable standards for resolving whether the House of Representatives constitutionally passed Act No. 288 and Act No. 357. Finally, for the judicial branch to declare the legislature's procedure for determining that a bill has passed would be to express a lack of the respect due that coordinate branch of government. For each of these three reasons, this case presents a nonjusticiable political question. We, therefore, vacate the trial court's judgment and dismiss this appeal.
*222 JUDGMENT VACATED; APPEAL DISMISSED.
NABERS, C.J., and HARWOOD, WOODALL, STUART, and BOLIN, JJ., concur.
PARKER, J., concurs specially.
SMITH, J., concurs in the result.
LYONS, J., recuses himself.
PARKER, Justice (concurring specially).
"It is emphatically the province and duty of the judicial department to say what the law is."
Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).
In these words, which enshrined the principle of judicial review, Chief Justice John Marshall noted that constitutional interpretation is emphatically the responsibility of the judiciary. He did not say that constitutional interpretation is exclusively the responsibility of the judiciary.

I.
The United States Constitution, Art. VI, requires federal and state officials to take oaths to support the Constitution of the United States. Similarly, the Alabama Constitution of 1901, Art. XVI, § 279, requires that "[a]ll members of the legislature, and all officers, executive and judicial," take oaths to "support the Constitution of the United States, and the Constitution of the State of Alabama." Because officers of each branch of the government must swear to support the Constitution, it is reasonable to conclude that officers of each branch have a duty of constitutional interpretation.
The belief that constitutional interpretation is exclusively a judicial duty is so entrenched today, however, that many are unaware that judicial review itself was far from a settled concept when the United States Constitution was drafted. The subject received only brief discussion at the Constitutional Convention; Gouverneur Morris of Pennsylvania supported judicial review, while John Francis Mercer of Maryland opposed it, and James Madison was skeptical of the notion:
"Mr. MADISON doubted whether it was not going too far to extend the jurisdiction of the Court generally to cases arising under the Constitution & whether it ought not to be limited to cases of a Judiciary Nature. The right of expounding the Constitution in cases not of this nature ought not to be given to that Department."
James Madison, Notes of Debates in the Federal Convention of 1787, at 462, 463, 539 (Ohio Univ. Press, 1985)(1893).
The delegates even considered the creation of a "Council on Revision," composed of members of the judicial branch and the executive branch, that would pass judgment upon the constitutionality of acts of Congress. Luther Martin of Maryland expressed reservations about granting this extra power to the judiciary, stating:
"A knowledge of Mankind, and of Legislative affairs cannot be presumed to belong in a higher degree to the Judges than to the Legislature. And as to the Constitutionality of laws, that point will come before the Judges in their proper official character. In this character they have a negative on the laws. Join them with the Executive in the Revision and they will have a double negative. It is necessary that the Supreme Judiciary should have the confidence of the people. This will soon be lost, if they are employed in the task of remonstrating [against] popular measures of the Legislature."
Notes of Debates, at 340 (footnote omitted).
During the debates over ratification of the Constitution, Alexander Hamilton *223 strongly supported judicial review in The Federalist Nos. 78 and 81 (Alexander Hamilton), whereas Madison's views, expressed in The Federalist Nos. 48 and 49 (James Madison), remained more equivocal.
In The Federalist No. 48, Madison declared that the legislature was the most powerful branch of government and thus potentially the most dangerous branch. Although the legislature was to be the natural guardian of the rights of the people, Madison expressed concern in The Federalist No. 49 that legislators would usurp power:
"We have seen that the tendency of republican governments is to an aggrandizement of the legislative at the expense of the other departments. The appeals to the people, therefore, would usually be made by the executive and judiciary departments."
The Federalist No. 49, at 274 (James Madison)(Global Affairs Publishing Co. 1987). But Madison stopped short of saying the judiciary had the power to nullify an act of Congress by declaring it unconstitutional.
George Washington, who served as president of the Constitutional Convention, seems to have envisioned each branch of government having its own role in constitutional interpretation, at least concerning those constitutional provisions pertaining to the powers of that branch.
In his 1796 Farewell Address as President, Washington declared that "It is important" that those in government "confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create ... a real despotism." George Washington, "Farewell Address 1796," I Compilation of Messages and Papers of the Presidents 211 (J.D. Richardson, ed., 1897).
Just before Marbury v. Madison was decided, Congressman Joseph Nicholson, a former judge, warned what might happen if a right of judicial review of constitutional questions was permitted to become a doctrine of judicial supremacy:
"By what authority are the judges to be raised above the law and above the constitution? Where is the charter which places the sovereignty of this country in their hands? Give them the powers and the independence now contended for, and they will require nothing more; for your government becomes a despotism, and they become your rulers. They are to decide upon the lives, the liberties, and the property of your citizens; they have an absolute veto upon your laws by declaring them null and void at pleasure; they are to introduce at will the laws of a foreign country, differing essentially with us upon the great principles of government; and after being clothed with this arbitrary power, they are beyond the controul of the nation, as they are not to be affected by any laws which the people by their representatives can pass. If all this be true; if this doctrine be established in the extent which is now contended for, the constitution is not worth the time we are now spending upon it. It is, as it has been called by its enemies, mere parchment. For these judges, thus rendered omnipotent, may overleap the constitution and trample on your laws; they may laugh the legislature to scorn and set the nation at defiance."[21]
*224 Debates in the Congress of the United States on the Bill for Repealing the Law "For the More Convenient Organization of the Courts of the United States;" During the First Session of the Seventh Congress 658-59 (Albany: Collier and Stockwell 1802).
Thomas Jefferson was a strong critic of judicial usurpation of power, especially after the 1803 decision in Marbury v. Madison. In 1804 he wrote concerning Marbury:
"[T]he opinion which gives to the judges the right to decide what laws are constitutional, and what not, not only for themselves in their own sphere of action, but for the legislature and executive also, in their spheres, would make the judiciary a despotic branch."
Thomas Jefferson, Letter to Abigail Adams, Sept. 11, 1804, 11 The Writings of Thomas Jefferson 51 (Albert Ellery Bergh, ed., 1907). In 1815 he wrote:
"The ... question, whether the judges are invested with exclusive authority to decide on the constitutionality of a law, has been heretofore a subject of consideration with me in the exercise of official duties. Certainly there is not a word in the Constitution which has given that power to them more than to the executive or legislative branches.... The constitutional validity of the law or laws again prescribing executive action, and to be administered by that branch ultimately and without appeal, the executive must decide for themselves also whether, under the Constitution, they are valid or not. So also as to laws governing the proceedings of the legislature, that body must judge for itself the constitutionality of the law, and equally without appeal or control from its coordinate branches. And, in general, that branch which is to act ultimately and without appeal on any law is the rightful expositor of the validity of the law, uncontrolled by the opinions of the other coordinate authorities."
Thomas Jefferson, 9 The Writings of Thomas Jefferson 517 (Paul Leicester Ford, ed., 1898) (emphasis added).
President Andrew Jackson also recognized the necessity of each branch's undertaking its own constitutional interpretation. In a July 10, 1832, message to Congress, Jackson announced that he was vetoing a bill reestablishing the national bank because he believed it was unconstitutional, *225 even though the United States Supreme Court had held to the contrary in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). President Jackson explained:
"It is maintained by the advocates of the bank that its constitutionality in all its features ought to be considered as settled by precedent and by the decision of the Supreme Court. To this conclusion I can not assent. Mere precedent is a dangerous source of authority, and should not be regarded as deciding questions of constitutional power except where the acquiescence of the people and the States can be considered as well settled....
"If the opinion of the Supreme Court covered the whole ground of this act, it ought not to control the coordinate authorities of this Government. The Congress, the Executive, and the Court must each for itself be guided by its own opinion of the Constitution. Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it, and not as it is understood by others. It is as much the duty of the House of Representatives, of the Senate, and of the President to decide upon the constitutionality of any bill or resolution which may be presented to them for passage or approval as it is of the supreme judges when it may be brought before them for judicial decision. The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both. The authority of the Supreme Court must not, therefore, be permitted to control the Congress or the Executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve."
Andrew Jackson, "Veto Message, July 10, 1832," III Compilation of Messages and Papers of the Presidents, 1144-45.
Applied to the legislative branch, this principle directs legislators to keep their oaths of office by exercising their authority and responsibility to consider the constitutionality of every bill that comes before them. If a legislator believes a bill to be unconstitutional, he has the right to propose a corrective amendment. If that fails, he has the right and duty to vote against such a bill. Likewise, a chief executive seeking to enforce a statute may be convinced that it is unconstitutional if construed a certain way. If so, according to the separation of powers and in keeping with his oath of office, the executive must exercise the authority and responsibility he possesses to construe the statute in such a way that it would be constitutional, where possible, and to enforce it accordingly.

II.
Even today, when deference to judicial review is perhaps the greatest it has ever been in the history of these United States, legal authorities continue to recognize that the legislative and executive branches of government are entitled to deference in constitutional interpretation, particularly where the interpretation is long-standing or where the subject matter is particular to the governmental branch interpreting the constitutional provision.
16 Am.Jur.2d Constitutional Law §§ 85-87 (1998), calls this the principle of "contemporaneous construction":
"§ 85. Contemporaneous or long-continued construction
"... [I]n questions of constitutional construction, as in the determination of the constitutionality of statutes, great weight has always been attached to contemporaneous exposition of the meaning *226 of fundamental law, not only where such interpretation is that of the courts, but also where it is that of other departments of government.
"....
"§ 86.  Acquiescence in construction
"It is a settled rule of constitutional construction that a long-continued understanding and application of a provision amounts to a practical construction of it. Such a construction, acquiesced in for many years, is frequently resorted to by the courts, because it is entitled to great weight and deference ... and will not be disregarded unless it clearly appears that it is erroneous....
"....
"§ 87. Legislative construction
"The principle of contemporaneous construction may be applied to the construction given by the legislature to the constitutional provisions dealing with legislative powers and procedure. Though not conclusive, such interpretation is generally conceded as having great weight or persuasive significance. It has been generally stated that contemporaneous construction of a constitutional provision by the legislature that has been continued and followed for a long time are valuable aids as to its proper interpretation ... and should not be departed from unless manifestly erroneous."
(Footnotes omitted.)
The United States Supreme Court embraced this principle in Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932): "General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to [the] meaning [of a constitutional provision]."
Likewise, in Moog v. Randolph, 77 Ala. 597, 606 (1884), the Alabama Supreme Court stated:
"The point for decision, therefore, may be considered to belong to that class of doubtful cases which permits for its solution the invocation of the doctrine of legislative construction. The principle has often been declared, that constitutions are to be construed in the light of previously existing constitutions, and that a uniform legislative interpretation of a doubtful clause, running through many years, is of weighty consideration with the courts, as is also the contemporaneous exposition of the bar."
See, also, Parke v. Bradley, 204 Ala. 455, 86 So. 28 (1920).
This principle of deference to a long-standing legislative construction of a constitutional provision applies with special force to legislative interpretation of a constitutional provision that relates directly to the rules and procedures by which the legislature operates.

III.
The instant case addresses precisely this type of legislative interpretation. Section 63 of the Alabama Constitution of 1901 provides that "no bill shall become a law" unless "a majority of each house be recorded thereon as voting in its favor...." This provision could be interpreted at least three ways:
1. An absolute majority of each house  that is, 53 members of the 105-member House of Representatives and 18 members of the 35-member Senate  must vote in favor of a bill for the bill to pass;
2. Assuming a quorum of 53 House members and 18 Senate members are present when a vote is taken, a majority of those 53 House members (at least 27) and a majority of those *227 18 Senators (10) must vote in favor of the bill; or,
3. Assuming a quorum of each house is present, a majority of those present and voting in each house must vote in favor of the bill (e.g., if 53 House members are present, and 10 vote "yes" and five vote "no" and the remaining 38 do not vote, the bill passes the House; similarly, if 18 Senators are present, of which 5 vote "yes" and 3 vote "no" and the remaining 10 do not vote, the bill passes the Senate).
As Justice See demonstrates in his opinion, the Alabama Legislature has consistently followed the third interpretation for at least three decades. I believe the Legislature is within its authority to interpret § 63 in this way, and I therefore conclude that this Court should defer to that interpretation. By so deferring, we show proper respect to a coordinate branch of government.
NOTES
[1] This case was originally assigned to another Justice; it was reassigned to Justice See subsequent to oral argument.
[2] Section 9 of Act No. 545 provided that the act would become operative "only ... on the date when the bond counsel for any bonds issued by the [A]uthority certifies to the revenue director that revenue sources ... available from this act and [other sources] ... are sufficient to provide debt service on a bond issue of $300,000,000." Thus, Act No. 288 removed the precondition to the imposition of the tax that bond counsel certify that there would be sufficient revenue sources to provide debt service on a $300 million bond issue.
[3] Ala.Code 1975, § 6-6-751, provides that when the governing body of a political subdivision takes action to issue obligations of the subdivision, the governing body may,

"before the issuance of any of such obligations, determine its authority to issue such obligations and the legality of all proceedings had or taken in connection therewith, the validity of the tax or other means provided for the payment thereof and the validity of all pledges of revenues and of all covenants and provisions contained in any such ordinance or resolution by filing a petition against the taxpayers and citizens of the political subdivision in the circuit court of the county in which ... such proceedings have been had or taken."
[4] The Authority requested the Jefferson Circuit Court to enter a judgment determining that

"the Authority is authorized to issue the bond, that all proceedings had or taken in connection therewith are legal and valid, that all revenues provided for the payment of the bond are legal and valid, that all covenants and provisions contained in [the Authority's] resolution [approving the issuance of the bond], [the Authority's] enabling act[s], and [in Act No. 288 and Act No. 357] are legal and valid, that the Authority has the authority to levy, collect and pledge the [revenue due the Authority as a result of Act No. 288 and Act No. 357] and that the Authority is authorized to issue and sell the bond in the form, manner and for the purpose contemplated in the Authority's resolution."
[5] As a matter of "local legislative courtesy," members of the legislature abstain from voting on a bill of purely local application unless the bill is applicable to the legislator's county. The trial court noted, however, that the legislature does not in fact follow the practice as is demonstrated by the fact that many bills pass or fail without the assistance of local legislators, that is, often the deciding votes are cast by legislators not affected by the bill.
[6] House Rule 49 contemplates that fewer than a quorum may vote on a bill:

"[W]hen any question is put to the House, and a quorum is not recorded as voting, the Speaker shall, before announcing the vote, instruct the Clerk to record as present a sufficient number of those members physically present in the House to constitute a quorum, though all present are not participating."
[7] The rules and practice of the Alabama Senate are not at issue, because the Authority does not dispute that a sufficient number of favorable votes were cast in the Senate to pass the challenged bills. However, we note that it is undisputed that the Senate also deems a bill passed when it receives a favorable majority of the votes cast in the presence of a quorum. The director of Alabama Legislative Reference Service, Jerry L. Bassett, testified by affidavit that his staff had identified 315 acts that had passed the Alabama Legislature since 1979 with a quorum present but having received favorable votes of less than a majority of a quorum in the respective houses, that is, having received fewer than 27 favorable votes in the House or fewer than 10 favorable votes in the Senate.
[8] Section 66 of the Constitution provides: "The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature...."
[9] In the four earlier opinions, members of this Court had expressed concerns about the separation-of-powers mandate of the Alabama Constitution and about the need for judicial restraint. In Ex parte James this Court listed the following separation-of-powers concerns that had been expressed by members of the Court during the nine-year pendency of that case:

"See James v. Alabama Coalition for Equity, Inc., 713 So.2d 937, 943 (Ala.1997) (discussing the Court's refusal to review the merits of the Liability Order); Id. at 953 (Maddox, J., concurring in the result but dissenting from the rationale, noting that [the Equity Funding] case involves `a debate about the doctrine of separation of powers among coordinate, independent branches of state government and about whether certain orders were "final" or not'); Ex parte James, 713 So.2d 869, 878 (Ala.1997) (refusing to consider the merits of the Liability Order, but addressing the political-question doctrine and noting `the American judiciary's understandable preference for restraint in this complex area of litigation,' 713 So.2d at 881); Id. at 891-94 (Maddox, J., concurring in part and dissenting in part, opining that state officials `should be free to exercise their discretion,' 713 So.2d at 894, with regard to their school-funding duties); Pinto v. Alabama Coalition for Equity, 662 So.2d 894, 900 (Ala.1995) (refusing to allow intervention to `reopen or relitigate the question of the constitutionality of the educational system'); Id. at 901 (Maddox, J., concurring specially, stating that `the question of the power of the circuit court, in the remedy phase, might, and probably will, present questions involving the division of powers between the Executive Branch and the Legislative and Judicial Branches of government'); Id. at 903 (Houston, J., concurring in the result, discussing Ala. Const. 1901, § 43, and noting that the legislative and executive branches have the responsibility of `providing for public education'); Opinion of the Justices No. 338, 624 So.2d 107, 110 (Ala.1993) (discussing the `principle of separation of powers' and noting that `[t]he executive and legislative branches of the State have broad powers and responsibilities in the area of public education')."
836 So.2d at 815-16.
[10] This Court has a constitutional duty not to exercise the powers of the legislative branch or the executive branch; we also have a constitutional duty to decide questions that are properly before us. See, e.g., Rice v. English, 835 So.2d 157 (Ala.2002). Rice was a challenge to the constitutionality of Alabama's legislative districts, and Justice Houston issued a special concurrence, in which he stated that because of the separation-of-powers provision of the Alabama Constitution, "it is for the Legislature, not the judiciary, to determine whether these senatorial districts are as `nearly equal to each other in the number of inhabitants as may be.'" 835 So.2d at 168. The main opinion held the matter justiciable and addressed the merits of the case, responding that "[s]uch abdication of judicial responsibility [as advocated by Justice Houston's special writing] is inconsistent with the settled principle that the people have forbidden the Legislature from conducting itself in a manner inconsistent with their constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution." 835 So.2d at 162. The main opinion cited Ex parte Selma & Gulf R.R., 45 Ala. 696 (1871), but noted that Selma & Gulf R.R. also recognized the need for judicial restraint. This Court afforded great deference to the challenged legislative act and held that the plaintiff had not overcome the presumption of constitutionality accorded to an act of the legislature. Thus, where an issue has not been reserved to the legislative branch, we will address it, affording great deference to the legislature.
[11] In Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849), an early case in the development of the political-question doctrine, the Supreme Court of the United States was called upon to determine the legitimacy of the government of Rhode Island. Chief Justice Taney, writing for the Court, concluded that the question was a political one reserved for Congress ("[I]t rests with congress to decide what government is the established one in a State.... And its decision is binding on every other department of the government and could not be questioned in a judicial tribunal.") id. at 42.
[12] In Poe v. Ullman, 367 U.S. 497, 508-09, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (plurality opinion), the Supreme Court of the United States noted:

"Justiciability is of course not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures, including the appropriateness of the issues for decision by this Court and the actual hardship to the litigants of denying them the relief sought."
[13] In turning for insight to decisions of the Supreme Court of the United States, we remain mindful that the Alabama Constitution differs materially from the United States Constitution in that the Constitution of the United States prohibits Congress from exercising any power not expressly granted to it by the Constitution, while the Constitution of Alabama allows the legislature to exercise all power not expressly prohibited by the Constitution. See Van Hart v. deGraffenried, 388 So.2d 1196, 1198 (Ala.1980), quoting County Bd. of Educ. of Russell County v. Taxpayers & Citizens of Russell County, 276 Ala. 472, 478, 163 So.2d 629, 634 (1964) ("`All the legislature is not forbidden to do by the organic law, state or federal, it has full power to do.'"). On the other hand, the separation-of-powers doctrine is explicit in the Alabama Constitution.
[14] Professor Louis Henkin writes that the political-question doctrine consists of the following propositions:

"1. The courts are bound to accept decisions by the political branches within their constitutional authority.
"2. The courts will not find limitations or prohibitions on the powers of the political branches where the Constitution does not prescribe any.
"3. Not all constitutional limitations or prohibitions imply rights and standing to object in favor of private parties.
"4. The courts may refuse some (or all) remedies for want of equity.
"5. In principle, finally, there might be constitutional provisions which can properly be interpreted as wholly or in part `self monitoring' and not the subject of judicial review."
Louis Henkin, Is There a "Political Question" Doctrine?, 85 Yale L.J. 597, 622-23 (1976) (footnote omitted).
[15] The Supreme Court was also persuaded by two other factors not relevant here: "First, the Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses  the impeachment trial and a separate criminal trial.... Second, judicial review would be inconsistent with the Framers' insistence that our system be one of checks and balances" because, "impeachment was designed to be the only check on the Judicial Branch by the Legislature." 506 U.S. at 234-35, 113 S.Ct. 732.
[16] This Court had previously held: "The Legislature has no power, unless elsewhere provided in the Constitution, to make convicted felons of the class named eligible to office. To that extent section 60 is a limitation on legislative power." State ex rel. Moore v. Blake, 225 Ala. 124, 126, 142 So. 418, 419 (1932).
[17] The Supreme Court explained:

"[T]he concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch."
Nixon, 506 U.S. at 228-29, 113 S.Ct. 732.
[18] Whether there are judicially discoverable and manageable standards sufficient for the review of a question depends upon the question presented. See Baker v. Carr, 369 U.S. at 211-12, 82 S.Ct. 691 ("There are sweeping statements to the effect that all questions touching foreign relations are political questions.... Yet it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." (footnote omitted)). Thus, although neither § 53 nor any other provision of the Alabama Constitution provides us with sufficient criteria for review of the question before us today, the requirement in § 53 that in order for a bill to pass a "majority of each house" shall vote in favor of the bill would surely offer sufficient guidance if the question before us was not whether a vote of 23 yeas and 3 nays is sufficient to pass a bill, but whether a vote of 3 yeas and 23 nays is sufficient.
[19] Marshall Field & Co. argued that the "enrolled act, in the custody of the Secretary of State, and appearing, upon its face, to have become a law in the mode prescribed by the Constitution, is to be deemed an absolute nullity" because "the Congressional record of proceedings, reports of committees of each house, reports of committees of conference, and other papers printed by authority of Congress" showed that "a section of the bill, as it finally passed, was not in the bill authenticated by the signatures of the presiding officers of the respective houses of Congress, and approved by the President." 143 U.S. at 668-69, 12 S.Ct. 495. The Supreme Court conceded that the general principle that an act that has not in fact been passed by Congress "does not become a law of the United States" is correct. However, the Court stated that that concession was not determinative of the precise question before it, "for it remains to inquire as to the nature of the evidence upon which a court may act when the issue is made as to whether a bill ... was or was not passed by Congress." 143 U.S. at 670, 12 S.Ct. 495. The Supreme Court rejected Field's contention that the object of the constitutional requirement that "each house shall keep a journal of its proceedings," art. 1, § 5, is to make the journal the best, if not conclusive, evidence as to whether a bill was, in fact, passed by the two houses of Congress. Rather, the Supreme Court held that, an enrolled act that has been attested as having passed Congress by the presiding officer of both houses and that has been approved by the President, "is sufficient evidence of itself  nothing to the contrary appearing upon its face  that it passed Congress." 143 U.S. at 672, 12 S.Ct. 495. The Supreme Court noted that any evils that may result from recognizing such an enrolled act as conclusive evidence that it had passed Congress would be far less than those that would result from a rule making the validity of congressional enactments depend upon the manner in which the journals of the houses are kept by subordinate officers. 143 U.S. at 673, 12 S.Ct. 495.
[20] Justice Scalia, concurring in the judgment in Munoz-Flores, stated that Field v. Clark would lead him to the conclusion that the federal courts should not undertake an independent investigation into the origination of a statute and determine, as the majority did, whether a revenue bill originated in the House as the Origination Clause requires. 495 U.S. at 408, 110 S.Ct. 1964.
[21] Judge Nicholson's 200-year-old warning could hardly be more timely than it is today. Despite everything in the text of the Constitution, its history, and the expressed intent of the Framers being completely contrary to the notion of judicial supremacy, the United States Supreme Court has presumptuously arrogated such a position for itself simply by declaring it so.

In Cooper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), the United States Supreme Court stated: "[Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803)] declared the basic principle that the federal judiciary is supreme in the exposition of the law of the Constitution and that principle has ever since been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system." Tellingly, this proclamation of judicial supremacy was made without citation to the Constitution or any other authority.
The result of this unconstitutional doctrine of judicial supremacy has been an increasing shift of the balance of powers from the elected executive and legislative branches of the federal government to the unelected judiciary, thereby emboldening federal courts to rule upon constitutional questions based upon foreign law or perceived changes in public opinion instead of the Constitution and its history.
In so doing, courts have taken one part of Chief Justice Marshall's opinion in Marbury v. Madison but ignored another: "[I]t is apparent, that the framers of the constitution contemplated that instrument, as a rule for the government of courts .... [A]nd that courts, as well as other departments, are bound by that instrument." Marbury, 5 U.S. (1 Cranch) at 180-81.
The turning away from our national compact by federal courts now threatens our country with a constitutional crisis.