Rel: December 22, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in <u>Southern Reporter</u>.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

### SC-2023-0421
_____

**Leah Abbott Belser**

**v.**

**Blount County**

**Appeal from Blount Circuit Court**
**(CV-22-900108)**

WISE, Justice.

Leah Abbott Belser, the plaintiff below, appeals from a judgment entered by the Blount Circuit Court in favor of Blount County, the defendant below. We affirm the trial court's judgment.

<u>Facts and Procedural History</u>

This case involves a lodging tax in Blount County that was levied pursuant to Act No. 2019-410, Ala. Acts ("the Act"). In its judgment, the trial court set forth the following undisputed facts:

> "1. Act 2019-410 was introduced as House Bill 564 in the 2019 Regular Session of the Alabama Legislature.
>
> "2. [House Bill] 564 came before the House of Representatives on May 8, 2019. Because the general fund and education budgets had not yet been passed, Ala. Const. Art. IV, § 71.01 required the House to first pass a budget isolation resolution ('BIR') by 'not less than three-fifths of a quorum present.'
>
> "3. The House of Representatives has interpreted this requirement in two different ways since § 71.01 was passed in 1981. From ratification until 2016, the House interpreted § 71.01 as requiring that a budget isolation resolution be passed by at least three-fifths of the members present and voting. Beginning in the 2017 Legislative Session, the House started to require a minimum of thirty-two (32) votes on any budget isolation resolution, reasoning that 'a quorum present' is fifty-three of the one hundred and five members, and that three-fifths of fifty-three members is thirty-two members.
>
> "4. The House passed the BIR on May 8, 2019 …. [House Bill] 564 was signed into law by Governor Ivey on June 6, 2019.
>
> "5. The Blount County Commission levied the tax in accordance with the authority granted to it by Act 2019-410."

On July 8, 2019, the Blount County Commission enacted a resolution that provided that, pursuant to the Act, a 4% lodging tax would be levied in Blount County effective September 1, 2019.

On August 29, 2022, Belser filed a putative "Class Action Complaint for Declaratory Judgment, Injunction, Tax Refund and Other Relief," challenging the constitutionality of the Act.[1] Among other things, she alleged that the Act is "void for violation of Amend. No. 448, 'the Budget Isolation Amendment." Specifically, she contended:

> "29. The citizens of this state, being aware of what has transpired in the past regarding bills making basic appropriations, directly addressed the responsibilities of not only the Governor, but also of the Legislature, in their primary task of passing general fund and education budgets during each regular session of the Legislature. Amendment No. 448 to the Alabama Constitution requires that the Governor '[o]n or before the second legislative day of each regular session of the legislature ... transmit to the legislature for its consideration a proposed budget for the then next ensuing budget period.' Section (c) of Amendment No. 448 provides that '[t]he duty of the legislature at any regular session to make the basic appropriations for any budget period that will commence before the first day of any succeeding regular session shall be paramount.' (Emphasis added). Ala. Const. Art. IV, § 71.01(C) (recodifying Ala. Const. Amend. No. 448, the 'Budget Isolation Amendment -- that appropriations bills must be 'paramount': passage of a Budget

---

[1]The record does not indicate that the trial court ruled on Belser's request for class certification.

3

Isolation Resolution ('BIR'). 'The house in which a bill is pending can, by adoption of a resolution concurred in by <u>three-fifths of the quorum present</u>, consider other legislation <u>Id.</u> (Emphasis added). More specifically, Amendment 448(C) states, in pertinent part

> "'[P]rovided ... that following adoption, <u>by vote of either house of not less than three-fifths of a quorum present</u>, of a resolution declaring that the provisions of this paragraph (C) shall not be applicable in that house to a particular bill, which shall be specified in said resolution by number and title, the bill so specified may proceed to final passage therein.

"Ala. Const. Amend. No. 448(C) (emphasis added).

"30. The requirement of Amendment 448(C) is that 3/5 of a 'quorum present' vote in favor of passing the BIR. Exhibit 2 proves that the 'quorum present' at the vote on the BIR related to [House Bill] 564 was 92. It is axiomatic that three fifths of 92 equals 55.1.

"31. On May 8, 2019, prior to the presentment of the State Education or General Fund Budgets to the Governor, the House of Representatives considered a BIR for [House Bill] 564. The recorded vote total for the BIR regarding [House Bill] 564 was yeas: 43, nays: 0, and abstains: 49. … Thus, in the presence of a quorum of 92, the 43 favorable votes fell below the 55 votes required to comply with Amendment 448(C). Nonetheless, on May 8, 2019, the presiding officer of the House signed and transmitted [House Bill] 564 to the Senate in violation of Amendment 448, Ala. Const., Art. IV, § 71.01. …

"32. Accordingly, the Act is null, void, and unenforceable by reason of violation of Amendment 448(C), Ala. Const., Art. IV, § 71.01."

4

On March 20, 2023, Belser filed a motion for a summary judgment. In her motion, she argued that the Act "is unconstitutional because the budget isolation resolution ('BIR') required by Amendment 448 to the Alabama Constitution lacked sufficient favorable votes to comply with Amendment 448(C)." She also argued:

> "2. On or about May 8, 2019, a Budget Isolation Resolution was adopted by the House of Representatives for House Bill 564.
>
> "3. The recorded vote on the Budget Isolation Resolution relating to House Bill 564 was yeas: 43, nays: 0, and abstains: 49.
>
> "4. On May 8, 2019, the State Education and General Fund Budgets had not been presented to the Governor.
>
> "5. On May 8, 2019, the presiding officer of the House of Representatives signed and transmitted House Bill 564 to the Senate."

Belser went on to argue:

> "The … language [of Amendment 448] clearly and unambiguously reveals the purpose and intent of Amendment 448 in four critical ways. First, that the objective of the Amendment is to make adoption of the state budgets the paramount -- or primary -- duty of the legislature. Second, to accomplish this objective when the legislature has failed to make basic appropriations, the Amendment prohibits the presiding officers of the house and senate from signing or transmitting any non-appropriations bill without first passing a [Budget Isolation Resolution ('BIR')] that complies with the Amendment's formula. Third, by expressly and

5

unambiguously setting the number of votes required to lawfully adopt a BIR at three-fifths of a quorum present, the Amendment intentionally establishes a high minimum threshold of votes necessary to proceed with a non-appropriations bill when the legislature has not yet met its paramount constitutional duty to make basic appropriations. Ala. Const., Amendment No. 448(C). And fourth, the Amendment restrains legislative authority by expressly prohibiting the legislature from altering the number of votes required to adopt a BIR by rule or statute. Ala. Const., Amendment 448(E). Taken together, these clearly demonstrate that Amendment 448's primary objective is to force the legislature to prioritize basic appropriations and to restrain legislative authority to act upon other matters unless and until it has met this paramount duty.

"Despite Amendment 448's express prohibition against rules or statutes altering the constitutional formula for determining the number of votes required to adopt a BIR[,] Defendant relies upon House Rule 36 …, which purports to diminish Amendment 448's constitutional threshold of votes necessary to adopt a BIR by authorizing the legislature to adopt a budget isolation resolution with only 'three-fifths [of a] majority of the members present and voting.' Specifically, House Rule 36 provides:

"'The following provisions shall apply to budget isolation resolutions (BIRs) that are provided for in Subsection C of [Amendment 448] of the Constitution of Alabama …:

"'(1) The Speaker shall determine the time allowed for debate before calling for a vote.

"'(2) If the resolution receives the three-fifths majority of the members present and voting required by the Constitution of the State of Alabama …, the Clerk shall call the attached bill.

6

"'(3) If the resolution is not adopted, the House shall proceed with other business.

"'(4) Each resolution is subject to one motion for reconsideration.

"'([5]) Pertaining to local bills and notwithstanding [House] Rule 31, following adoption of the resolution, any member may make a motion to provide for an expression of local courtesy on the resolution. Such motions, which are not subject to debate or reconsideration, may only be voted on by members who represent areas outside the counties or municipalities affected by the bill associated with the resolution. Yea votes on the motion shall be reflected in the Journal as those members who voted for the resolution only as a matter of local courtesy and not as a position for or against the bill. All votes on motions to express local courtesy must be recorded votes.'

"Ala. House Rule 36 (emphasis added)."

Belser argued that House Rule 36(2) "is a clear violation of Amendment 448(E)." Specifically, she contended that

"[t]he purpose and intent of House Rule 36 is immediately evident -- to circumvent Amendment 448(C) by substituting a lesser favorable vote requirement than the constitutionally-mandated 'three-fifths of a quorum present,' in effect allowing the adoption of a [budget isolation resolution] with as few as two affirmative votes when only three votes are cast in the House of Representatives, a legislative body containing 105 members."

Belser attached an affidavit from Jeff Woodard, the Clerk of the House of Representatives. In his affidavit, Woodard stated:

"2. I am the Clerk of the Alabama House of Representatives. I was elected to this position in May 2012 as the 'clerk in waiting' to take over when the former clerk retired. I officially took office on October 1, 2012, and was re-elected to serve a full term in January 2015.

"3. The duties of the clerk include, but are not limited to: certifying each bill that passes as required by House of Representative Rule 82; enforcing the House Rules as appropriate; providing parliamentary advice to the House; keeping its records; and supervising other legislative staff.

"4. I previously served as the Assistant Clerk from January 2011 to May 2012.

"5. Prior to becoming the Assistant Clerk, I was the Chief of Staff to the Speaker of the House from January 1999 to January 2011, and a Confidential Assistant from January 1991 to January 1999.

"6. I worked as a journalist covering Alabama politics for various publications from 1982 until 1991.

"7. I have personal knowledge of the way in which the Alabama House of Representatives has interpreted and implemented Ala. Const. Art. IV, § 71.01 since it was proclaimed as ratified on December 10, 1984. This knowledge is based on both my own personal observations and experience as well as my familiarity with legislative history and records.

"8. From ratification of the amendment until 2016, the Alabama House of Representatives interpreted § 71.01 as requiring a budget isolation resolution be passed by at least three-fifths of the members present and voting. This

8

interpretation was based on historic, legal, and practical considerations, which were discussed at length during the litigation in <u>Jefferson County v. Taxpayers</u>, Civil Action No. CV-2015-903133.00, Appeal Nos. 1150326 and 1150327[,] specifically including in the Brief of Amici Curiae the Speaker of the Alabama House of Representatives and the President Pro Tempore of the Alabama Senate in Support of Jefferson County and the Jefferson County Commission. This practice was formally codified in Alabama House of Representatives, Rule 36, in 1995.

"9. The House of Representatives has always maintained that its interpretation is a valid exercise of the House's inherent authority to govern its own proceedings, and that Rule 36 is a valid exercise of the House's duty and authority under Alabama law to adopt formal rules of parliamentary procedure. Nevertheless, beginning in the 2017 Legislative Session, the House -- out of an abundance of caution -- started to require a minimum of thirty-two (32) votes on any budget isolation resolution. A budget isolation resolution must be passed by a vote of 'not less than three-fifths of <u>a</u> quorum present (Ala. Const. § 71.01(C) (emphasis added)). 'A quorum present' in the House is fifty-three of the one hundred and five members. Three-fifths of fifty-three members is thirty-two members. This procedure has been followed in each succeeding session.

"10. Based on my experience with and knowledge of the legislative process, it is my opinion that requiring budget isolation resolutions to be passed by three-fifths of <u>the</u> specific quorum actually present at the time in the House of Representatives would be impractical and would introduce uncertainty and needless complexity into the process.

"11. All statements made in this Affidavit are based on my personal knowledge and are true and correct to the best of my knowledge. Any opinion is based on my personal knowledge and perceptions."

9

(Emphasis in original.)

On May 10, 2023, Blount County filed its response in opposition to Belser's motion for a summary judgment and its own motion for a judgment on the pleadings. Relying on this Court's decision in Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So. 2d 204 (Ala. 2005) ("BJCCA"), the County argued that this case presents a nonjusticiable political question.[2]

On May 12, 2023, the trial court conducted a hearing on the parties' motions. On May 31, 2023, the trial court entered its judgment, in which it denied Belser's motion for a summary judgment and granted the County's motion for a judgment on the pleadings. This appeal followed.

<u>Discussion</u>

Belser argues that the language in Art. IV, § 71.01, Ala. Const. 1901 (Off. Recomp.), which was formerly Amend. No. 448, Ala. Const. 1901,

---

[2]The County raised other arguments that are not relevant to our disposition of this appeal. However, we do note that one of the County's other arguments was a contention that the legitimacy of House Rule 36, upon which Belser bases her argument, was not before the trial court because the budget isolation resolution at issue in this case was passed using a procedure other than the procedure set forth in House Rule 36, which was explained in Woodard's affidavit.

requires that any budget isolation resolution ("BIR") be passed by at least three-fifths of the members who were <u>actually present and voting</u> when the BIR was passed. However, based on the information set forth in Woodard's affidavit, the Alabama House of Representatives instead requires a minimum of 32 votes on a BIR, based on the fact that a quorum of the 105 members of the House is 53 members and that three-fifths of 53 members is 32 members. The trial court held that the question of how to determine what constitutes "not less than three-fifths of a quorum present" is a nonjusticiable political question.

Belser argues that the trial court erred in concluding that this case involves a nonjusticiable political question. In reaching its decision, the trial court relied on this Court's previous decision in <u>BJCCA</u>, in which this Court considered what constitutes a nonjusticiable political question, explaining as follows:

> "The Constitution of Alabama expressly adopts the doctrine of separation of powers that is only implicit in the Constitution of the United States. <u>Opinion of the Justices No. 380</u>, 892 So. 2d 332, 334 n.1 (Ala. 2004). This Court has said that the Alabama Constitution provides that the 'three principal powers of government shall be exercised by separate departments,' and it 'expressly vest[s] the three great powers of government in three separate branches.' <u>Ex parte Jenkins</u>, 723 So. 2d 649, 653-54 (Ala. 1998). Section 42, Ala. Const. 1901, provides:

11

"'The powers of the government of the State of Alabama shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.'

"Section 43 provides:

"'In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; to the end that it may be a government of laws and not of men.'

"'"Great care must be exercised by the courts not to usurp the functions of other departments of government. § 43, Constitution 1901. No branch of the government is so responsible for the autonomy of the several governmental units and branches as the judiciary."' Piggly Wiggly No. 208, Inc. v. Dutton, 601 So. 2d 907, 911 (Ala. 1992) (quoting Finch v. State, 271 Ala. 499, 503, 124 So. 2d 825, 829 (1960)). Thus, just as this Court will declare legislative usurpation of the judicial power violative of the separation-of-powers provision of our Constitution, see, e.g., Ex parte Jenkins, supra, so it must decline to exercise the judicial power when to do so would infringe upon the exercise of the legislative power.

"The separation-of-powers provision of the Alabama Constitution limits the jurisdiction of this Court. …

12

"... [Q]uestions regarding jurisdiction, that is, questions of the constitutional authority of the courts to exercise power over a matter -- going to the very core of the Constitution's structuring the government to constrain its exercise of power -- are of such importance that it is the duty of this Court to consider the absence of jurisdiction on our own initiative. See Baldwin County v. Bay Minette, 854 So. 2d 42 (Ala. 2003). The oath of office taken by the Justices on this Court to 'support the Constitution of the State of Alabama' requires us to consider whether this Court has jurisdiction over a particular matter. See § 279, Ala. Const. 1901.

"Because the judicial branch 'shall never exercise the legislative and executive powers, or either of them,' this Court will not decide 'political questions,' even if submitted to it. The Supreme Court of the United States has with some frequency addressed whether certain issues are nonjusticiable political questions. We have previously referred to the United States Supreme Court's formulation of what constitutes a nonjusticiable political question, and we look to it again in this case. See, e.g., Ex parte James, 836 So. 2d 813, 842 n.25 [(Ala. 2002)]; Ex parte James, 713 So. 2d 869, 903 [(Ala. 1997)] ; State ex rel. James v. Reed, 364 So. 2d 303, 305 (Ala. 1978). In Baker v. Carr, 369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), the Supreme Court of the United States offered the following description:

"'It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3]

13

the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.'

"369 U.S. at 217, 82 S. Ct. 691.  The presence of one or more of the factors listed in Baker v. Carr indicates that a question is 'political,' that is, one reserved for, or more suitably determined by, one of the political branches of government.  If a question is one properly to be decided by the executive or legislative branch of government, rather than by the judicial branch, we will not decide it.  At least three of the factors enunciated in Baker v. Carr are present in this case.

"1.     Textually     demonstrable     constitutional commitment of the issue to a coordinate political department.

"In Nixon v. United States, 506 U.S. 224, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993), a former chief judge of the United States District Court for the Southern District of Mississippi, Judge Walter L. Nixon, was impeached by the United States House of Representatives and was convicted by the Senate. Nixon argued that Senate Rule XI, under which he was tried and convicted, was unconstitutional because it provided for a Senate committee, rather than for the full Senate, to participate in the evidentiary hearings.

"The first sentence of the Impeachment Trial Clause, Art. I, § 3, cl. 7, United States Constitution, states that '[t]he senate shall have the sole power to try all impeachments.'

14

The Supreme Court affirmed the lower court's ruling that the matter is nonjusticiable, holding that the language of the Impeachment Trial Clause demonstrates a commitment of the matter of impeachments to the Senate. The Supreme Court explained that in order to determine whether there is a textually demonstrable constitutional commitment of an issue to a coordinate political department, a court must, in the first instance, interpret the text in question and determine to what extent the issue is textually committed. 506 U.S. at 228, 113 S. Ct. 732 (citing Powell v. McCormack, 395 U.S. 486, 519, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969)). The Supreme Court concluded that the first sentence of the Impeachment Trial Clause is a grant of authority to the Senate and that the word 'sole' indicates that the authority is reposed in the Senate and nowhere else. 506 U.S. at 229, 113 S. Ct. 732. The Supreme Court was unpersuaded by Nixon's argument that 'sole' means merely that the Senate, as opposed to the courts or a lay jury or a Senate committee, may try impeachments. The Supreme Court, quoting Webster's Third New International Dictionary (1971), noted that 'sole' is defined as ' "functioning ... independently and without assistance or interference," ' 506 U.S. at 231, 113 S. Ct. 732, and that allowing judicial review of impeachments would be inconsistent with the use of the word 'sole.' The Court held, therefore, that the use of the word 'sole' in the Impeachment Trial Clause means that the Senate's impeachment power is not subject to judicial review.

"The Supreme Court's distinguishing of Nixon from Powell v. McCormack, 395 U.S. 486, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969), is instructive. In Powell, the Supreme Court had examined the issue whether the constitutional commitment to the House of Representatives of the authority to judge the qualifications of its members precluded judicial review of such a determination. Article I, § 5, provides: 'Each House shall be the judge of the elections, returns and qualifications of its own members.' However, Art. I, § 2, specifies three requirements for membership in the House: a member of the House must have attained the age of 25 years,

15

must have been a citizen of the United States for 7 years, and must be an inhabitant of the state from which he is elected. In Powell, the Supreme Court held that those three specific requirements impart to the word 'qualifications' in Art. I, § 5, 'a precise, limited nature.' 395 U.S. at 522, 89 S. Ct. 1944. Thus, the House's argument that its power to judge the qualifications of its own members is a textually demonstrable commitment of unreviewable authority is 'defeated by the existence of this separate provision specifying the only qualifications which might be imposed for House membership.' Nixon, 506 U.S. at 237, 113 S. Ct. 732 (discussing Powell).

"In Nixon, on the other hand, there is no separate provision of the Constitution that would be defeated by allowing the Senate final authority to determine the meaning of the word 'try' in the Impeachment Trial Clause. 506 U.S. at 237-38, 113 S. Ct. 732. The Supreme Court in Nixon recognized that, although courts do possess the power to review legislative or executive actions that transgress identifiable textual limits, the word 'try' in the Impeachment Trial Clause does not provide an identifiable textual limit on the authority committed to the Senate to conduct impeachment proceedings. Id. Thus, the Supreme Court concluded, the question of how the Senate may 'try' an impeachment is a nonjusticiable political question.

"In State of Alabama ex rel. James v. Reed, 364 So. 2d 303 (Ala. 1978), this Court considered whether the question of a legislator's ability to hold office is nonjusticiable because it is committed to the legislature by the text of the Alabama Constitution. The State brought a quo warranto action challenging the qualifications of Thomas Reed to hold office as a member of the Alabama House of Representatives. Reed had been previously convicted of attempted bribery. This Court recognized that if the authority to pass on the question of Reed's eligibility is vested exclusively in the House of Representatives, then the question presented is a political one

16

barred from judicial resolution by the separation-of-powers doctrine. 364 So. 2d at 305. Reed contended that §§ 51 and 53, Ala. Const. 1901, are a textually demonstrable constitutional commitment of the issue of a House member's eligibility to the legislature and, therefore, that the question is nonjusticiable. Section 51 provides: 'Each house shall choose its own officers and shall judge the election, returns, and qualifications of its members.' Section 53 provides: 'Each house shall have power to determine the rules of its proceedings....'

"This Court determined in Reed that §§ 51 and 53 do not demonstrate a constitutional commitment of the issue to the legislature. However, the holding expressly rested on the presence of § 60, Ala. Const. 1901, which provides that '[n]o person convicted of embezzlement of the public money, bribery, perjury, or other infamous crime, shall be eligible to the legislature, or capable of holding any office of trust or profit in this state.' This Court held that § 60 is a specific constitutional limitation on legislative authority, like the three requirements for membership in the United States House of Representatives the Supreme Court of the United States considered in Powell v. McCormack. Because § 60 expressly limits legislative authority, this Court concluded, judicial enforcement of its mandate does not 'derogate the principle of separation of powers.' 364 So. 2d at 306. This Court concluded that to construe §§ 51 and 53 as vesting in the legislature exclusive authority on the issue, thereby removing it from judicial cognizance, would deprive § 60 of its field of operation. 364 So. 2d at 306-07.

"Section 63, Ala. Const. 1901, states that 'no bill shall become a law, unless ... a majority of each house be recorded [upon the journals] as voting in its favor.' The question presented in the case before us today is whether the rules and procedure by which the Alabama House of Representatives determined that the bills that became Act No. 288 and Act No. 357 each received a majority vote of the House are subject to

judicial review. Section 53, Ala. Const. 1901, expressly provides that '[e]ach house shall have power to determine the rules of its proceedings.' The power of the legislature to determine the rules of its own proceedings is 'unlimited except as controlled by other provisions of our Constitution,' and 'unless controlled by other constitutional provisions the courts cannot look to the wisdom or folly, the advantages or disadvantages of the rules which a legislative body adopts to govern its own proceedings.' Opinion of the Justices No. 185, 278 Ala. 522, 524-25, 179 So. 2d 155, 158 (1965).

"Unlike Reed, in which an express constitutional prohibition on a felon's serving in the legislature was applicable, and unlike Powell, in which express constitutionally identified qualifications for membership in the United States House of Representatives were applicable, there is in the case before us no provision of the Alabama Constitution that defines or limits what is meant by the term 'a majority of each house,' and there is no other provision of the Constitution that would be defeated by allowing the legislature the final authority over its internal voting rules and procedures. Because the Alabama Constitution contains no limitation on the manner in which the legislature might interpret the phrase 'majority of each house' and because the Constitution clearly grants to the legislature the power to determine the rules of its own proceedings, whether a 'majority of each house' has voted in favor of a bill must be decided by the rules established by the legislature. We conclude that there is a textually demonstrable constitutional commitment to the legislature of the question of how to determine what constitutes a 'majority of each house ... voting in [the bill's] favor.' See Nixon, 506 U.S. at 230, 113 S. Ct. 732. Therefore, whether the legislature conducted its internal voting proceedings in compliance with § 63 is a nonjusticiable issue.

18

"2. Lack of judicially discoverable and manageable standards for resolving question.

"'[J]udicial action must be governed by standard, by rule. Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions.' Vieth v. Jubelirer, 541 U.S. 267, 278, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004) (discussing the 'lack of judicially discoverable and manageable standards' factor enunciated in Baker v. Carr).

"In Nixon v. United States, Nixon argued that his challenge to the constitutionality of Senate Rule XI was justiciable and that the word 'try' in the Impeachment Trial Clause imposes a constitutional requirement that an impeachment proceeding be in the nature of a judicial trial. The Supreme Court of the United States held, however, that a variety of definitions could be assigned to the word 'try' and that, therefore, the term lacks sufficient precision to afford a 'judicially discoverable and manageable standard[]' for the judiciary to apply in reviewing the legislative action. 506 U.S. at 230, 113 S. Ct. 732. The Supreme Court addressed the lack of a judicially discoverable and manageable standard for review together with its consideration of the textually demonstrable commitment of the matter to the legislative branch of government. It held that the lack of a judicially discoverable and manageable standard strengthened the conclusion that there had been a textually demonstrable commitment of the question to a coordinate branch of the government, and that the question was, therefore, nonjusticiable.

"Although this Court did not speak in terms of judicially discoverable and manageable standards in Reed, supra, the determination that the question presented in that case was justiciable rested on the existence of a separate constitutional

19

provision limiting the authority of the legislature in determining the eligibility of its members. The specific limitation of § 60 as to who could serve in the legislature provided the Court with a judicially discoverable and manageable standard for its review of the issue.

"The Constitution of Alabama, the only source of any limitation on the authority of the legislature, offers no such standard by which the judicial branch of the government can review the legislature's voting rules and procedures with respect to the legislature's determination that 'a majority of each house' voted in favor of the bills that became Act No. 288 and Act No. 357. The Constitution does not define the term 'majority of each house,' and the legislature's power to determine its rules regarding voting procedures is not limited by the text of the Constitution. Therefore, there is no manageable standard this Court can discover to guide our review of the legislative action at issue in this case. Because of the lack of judicially discoverable and manageable standards for resolving the question presented to us, we decline to decide it.

> "3.  Lack of the respect due coordinate branches of government.

"'The preservation of the constitution in its integrity and obedience to its mandates, is exacted alike from the legislative and the judicial departments of the government.' Mayor of Mobile v. Stonewall Ins. Co., 53 Ala. 570, 575 (1875). Legislators take the same oath of office that judges and justices take -- to 'support the Constitution of the United States, and Constitution of the State of Alabama.' See § 279, Ala. Const. 1901. The Constitution provides that '[e]ach house [of the legislature] shall have power to determine the rules of its own proceedings,' and the judiciary should presume that the legislators comply with their oath of office when they determine and apply those rules. If the judiciary questions the legislature's declaration that Act No. 288 and

Act No. 357 were validly enacted by the legislature, we would be demonstrating a lack of the respect due that coordinate branch of government.

"In Field v. Clark, 143 U.S. 649, 12 S. Ct. 495, 36 L. Ed. 294 (1892), The Tariff Act of October 1, 1890, was challenged as not being a law of the United States. The Supreme Court of the United States stated:

"'The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses, through their presiding officers, to the President, that a bill, thus attested, has received in due form, the sanction of the legislative branch of the government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries, on its face, a solemn assurance by the legislative and executive departments of the government, charged, respectively, with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to

21

accept, as having passed Congress, all bills authenticated in the manner stated: leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution.'

"143 U.S. at 672, 12 S. Ct. 495 (emphasis added). The Supreme Court noted the uncertainty and instability that would result if every person were free to '"hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not."' 143 U.S. at 677, 12 S. Ct. 495 (quoting Weeks v. Smith, 81 Me. 538, 547, 18 A. 325, 327 (1889)).

"We are here presented with a similar situation. In Baker v. Carr, the Supreme Court of the United States stated that the appropriateness of attributing finality to an action of one of the political departments is a 'dominant consideration' in determining whether a question falls within the political-question category. 369 U.S. at 210, 82 S. Ct. 691. We, like the United States Supreme Court in Field v. Clark, are persuaded that uncertainty and instability would result if every person were free to 'hunt through the journals of a legislature to determine whether a statute, properly certified by the speaker of the house and the president of the senate, and approved by the governor, is a statute or not,' 143 U.S. at 677, 12 S. Ct. 495 (quoting Weeks v. Smith, 81 Me. at 547, 18 A. at 327), and the internal proceedings of the legislature when passing a bill were to be subject to judicial challenge.

"The Supreme Court of the United States has explained that the language of Field v. Clark quoted above does not apply in the presence of a clear constitutional requirement that binds Congress. United States v. Munoz-Flores, 495 U.S. 385, 392 n.4, 110 S. Ct. 1964, 109 L. Ed. 2d 384 (1990). In Munoz-Flores, the Supreme Court of the United States was presented with a challenge to a revenue-raising act alleged

not to have originated in the House of Representatives, as required by Art. I, § 7, cl. 1, of the Constitution of the United States. In Field v. Clark, the Supreme Court had held that courts should not question an authentication by Congress that a bill has passed; that authentication 'should be deemed complete and unimpeachable.' 143 U.S. at 672, 12 S. Ct. 495. However, the Origination Clause at issue in Munoz-Flores specifically mandates that all revenue-raising bills originate in the House, and there is no question as to the meaning of the constitutional requirement that '[a]ll Bills for raising revenue shall originate in the House of Representatives.' We are not here presented with such a situation.

"In the case before us today, there is no clear constitutional provision binding the legislature to a certain manner of determining whether a 'majority of each house' has voted in favor of a bill. Thus, the rationale of Field v. Clark is applicable, and the judiciary should not question the determination by the legislative branch of whether a bill was passed by the requisite majority vote of the house. To do so would be to demonstrate a lack of the respect due a coordinate branch of government. As Justice Scalia says in his concurrence in Munoz-Flores:

> "'Mutual regard between the coordinate branches, and the interest of certainty, both demand that official representations regarding such matters of internal process be accepted at face value.'

"495 U.S. at 410, 110 S. Ct. 1964 (Scalia, J., concurring in the judgment).

"Because judicial review of the issue whether the bills that became Act No. 288 and Act No. 357 received the favorable vote of a 'majority of each house' would express a lack of the respect due that coordinate branch of government, the question presented is nonjusticiable. We, therefore, decline to decide it.

23

"Conclusion

"Section 53, Ala. Const. 1901, specifically commits to each house of the legislature the 'power to determine the rules of its own proceedings.' Our Constitution contains no identifiable textual limitation on the legislature's authority with respect to voting procedures that would permit judicial review of those procedures. There is also a lack of judicially discoverable and manageable standards for resolving whether the House of Representatives constitutionally passed Act No. 288 and Act No. 357. Finally, for the judicial branch to declare the legislature's procedure for determining that a bill has passed would be to express a lack of the respect due that coordinate branch of government. For each of these three reasons, this case presents a nonjusticiable political question."

912 So. 2d at 212-21 (footnotes omitted).

In its judgment in this case, the trial court stated, in relevant part:

"This Court holds that the proper interpretation of Ala. Const. Art. IV, § 71.01 is a nonjusticiable political question under the authority of Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So. 2d 204 (Ala. 2005).

"BJCCA was concerned with the proper interpretation of the voting requirement contained in Ala. Const. 1901, Art. IV, § 63. This case presents a very similar issue to that considered in BJCCA. Like the phrase 'a majority of each house' at issue in that case, 'three-fifths of a quorum present' is not specifically defined in the Alabama Constitution of 1901, nor does § 71.01 purport to except this requirement from the general rule that the Legislature has the authority to determine its own rules of proceedings.

24

"Also like § 63, § 71.01 can be interpreted in at least three different ways:  1) as applying only to that portion of a quorum present and voting; 2) as requiring a minimum number of thirty-two affirmative votes, representing three-fifths of a quorum present which is the method used in passing the budget isolation resolution attached to [the] Act…; or, 3) as requiring an affirmative vote of at least three-fifths of the members constituting the quorum present at the time, which is the method suggested by Plaintiff Belser.  The validity of the first 'present and voting' method is not before this Court.  The Parties' arguments regarding the second and third methods hinge on the use of the indefinite article 'a,' as opposed to the definite article 'the,' in § 71.01.

"At argument, Plaintiff criticized the Legislature for improperly attempting to thwart judicial review of the budget isolation resolutions by failing to include the necessary information in the Journals, indicating that the Legislature has stopped publishing even unofficial information regarding the vote on budget isolation resolutions on its website. Plaintiff stated that the Legislature easily could provide this information.  As pointed out by Defendant, however, nothing in § 71.01 requires the Legislature to take or record the vote using any particular method, i.e., by yeas and nays. The courts cannot impose extra-Constitutional duties on the Legislature.  See, e.g., Caudle v. Cotton, 234 Ala, 126, 128-129, 173 So. 847, 849 (1937); Cf. Ala. Const. 1901, Art. IV, § 63.

"Without the underlying information regarding the quorum present at the moment of a BIR vote and the number of legislators voting for, against, or abstaining from a vote, a court could never apply any particular interpretation of § 71.01 to a specific case.  The judiciary's role is to decide cases involving a 'definite and concrete' controversy brought before it by adverse parties; 'the declaratory judgment statutes do not empower courts to decide moot questions or abstract propositions or to give advisory opinions…' Baldwin County

v. Bay Minette, 854 So. 2d 42, 46, 47 (Ala. 2003)(internal quotations and emphasis omitted). This Court accordingly does not have subject matter jurisdiction to issue a legal conclusion that does not and/or cannot resolve a justiciable controversy.

"The Journal of the House of Representatives in this case indicates only that the BIR was passed by three-fifths of a quorum present. It is well-established that the Journals are the only admissible evidence of the actions of the Legislature; they 'can neither be contradicted nor amplified by loose memoranda made by the clerical officers of the house. Nor will it be presumed from the silence of the journals on a matter of which it is proper for them to speak that either house has disregarded a constitutional requirement in the passage of an act, except in those cases where the organic law expressly requires the journals to show the action taken, as where it requires the yeas and nays be entered.' State v. Joseph, 175 Ala. 579, 594, 57 So. 942, 947 (1911). The need to go so far beyond the text of [the] Act … and the Journals of the Legislature distinguishes this case from Magee v. Boyd, 175 So. 3d 79 (Ala. 2015). This Court notes that Magee v. Boyd does not purport to somehow overrule or even limit BJCCA, but instead explicitly distinguishes the two cases. 175 So. 3d at 104.

"The fact that § 71.01 does not require the Legislature to take or record a budget isolation resolution vote by any particular method only emphasizes several key factors identified by the BJCCA Court in its determination, including: '[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; ... [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government.' 912 So. 2d at 214-15."

26

This Court's reasoning in BJCCA supports the trial court's conclusion that this case involves a nonjusticiable political question. As was the situation in BJCCA, the Alabama Constitution does not place a limitation on the manner in which the legislature might interpret the phrase "not less than three-fifths of a quorum present." Also, the Constitution clearly gives the legislature the power to determine the rules of its own proceedings. Therefore, there is a textually demonstrable constitutional commitment to the legislature of the question of how to determine what constitutes "not less than three-fifths of a quorum present." Additionally, there are not any judicially discoverable and manageable standards for resolving whether the House of Representatives constitutionally passed the BIR for House Bill 564 that became the Act. Finally, judicial review of the issue as to whether the BIR for House Bill 564 received the favorable vote of a "not less than three-fifths of a quorum present" would express a lack of the respect due to a coordinate branch of government. For these reasons, we conclude that the issue whether the legislature conducted its internal voting proceedings in compliance with § 71.01 is a nonjusticiable political question.

Conclusion

For the above-stated reasons, we affirm the trial court's judgment.[3]

AFFIRMED.

Parker, C.J., and Bryan, Mendheim, Stewart, and Cook, JJ., concur.

Mitchell, J., concurs specially, with opinion.

Shaw and Sellers, JJ., concur in the result.

---

[3]Because we conclude that Belser's challenge of the Act raises a nonjusticiable political question, we pretermit addressing the remaining issues she has raised in her brief to this Court.

MITCHELL, Justice (concurring specially).

The idea that courts should refrain from deciding "political questions" is deeply embedded in our jurisprudence. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803) ("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this [C]ourt."). But the application and scope of the political question doctrine has generated confusion within the courts -- including our own -- with Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So. 2d 204 (2005) ("BJCCA"), being a salient example. I write separately in an effort to clear up some of this confusion and to express my views on the limits of the political question doctrine.

In BJCCA, this Court said that political questions have jurisdictional consequences. 912 So. 2d at 213 (noting that while neither party had "argued that the issue before us is nonjusticiable … it is the duty of this Court to consider the absence of jurisdiction" (emphasis added)). Consequently, once the Court determined in BJCCA that the issue presented was a nonjusticiable political question, it concluded that

it must dismiss the appeal for lack of subject-matter jurisdiction. See id. at 225.

In my view, that reasoning conflated two distinct concepts: jurisdiction and justiciability. While the two often go hand in hand, they are not synonymous; it is possible for our Court to exercise subject-matter jurisdiction in a controversy that proves to raise a nonjusticiable issue. That is true of cases raising political questions because the political question doctrine does not "rest on limits on … courts' authority to decide cases." John Harrison, The Political Question Doctrines, 67 Am. U.L. Rev. 457, 509 (2017).[4] Rather, it tells us under which circumstances courts should accept the lawful authority of another political branch. Of course, before courts may decide whether they should defer to the

---

[4]The leading United States Supreme Court case on the political question doctrine, Baker v. Carr, 360 U.S. 186, 196 (1962), also preserved this important distinction by "classif[ying] the political question doctrine as one of non-judicial finality, not as a limitation on Article III or statutory jurisdiction." Harrison, 67 Am. U.L. Rev. at 497. The Court later decided another political question case, Nixon v. United States, 506 U.S. 224 (1993), based on this distinction. In Nixon, the federal district court concluded that it had subject-matter jurisdiction to hear the case but dismissed it because the Court concluded that the controversy presented a nonjusticiable political question. Both the Court of Appeals and the Supreme Court went on to affirm that judgment, which was on the merits.

discretion of another branch, they must first determine the scope of that branch's discretion, which is a substantive inquiry that goes to the merits of the case. The political question doctrine therefore acts as a substantive rule. And because it does, courts must exercise subject-matter jurisdiction when they apply that rule, even if they ultimately enter a judgment of dismissal.

That was true in BJCCA, in which this Court considered whether the interpretation of § 63 of the Alabama Constitution of 1901 -- which provided that "no bill shall become a law" unless "a majority of each house" votes in its favor -- was a political question committed to the discretion of the Legislature. The city and the county challenging the acts at issue in BJCCA argued that "a majority of each house" in the Legislature meant that a bill must receive a majority of a quorum of the House of Representatives. But the Legislature interpreted § 63 to mean that "when a quorum is present and a bill receives a favorable majority [of that number], then the bill has passed that house of the [L]egislature." 912 So. 2d at 208.

Our Court never reached the ultimate question of whose interpretation was superior because it concluded that its review was

foreclosed by a threshold political question. In particular, the Court reasoned that § 63 was not sufficiently precise to afford any "judicially discoverable and manageable standards for resolving whether the House of Representatives constitutionally passed [an act]." Id. at 221. And the Court determined that § 53 of the Alabama Constitution of 1901 -- which gave the Legislature the "power to determine the rules of its own proceedings" -- was a "textually demonstrable constitutional commitment" to the Legislature to interpret § 63. Id. at 218. As a result, the Court dismissed the appeal for lack of subject-matter jurisdiction.

But when I examine BJCCA, it seems clear that while our Court characterized the fundamental issue as jurisdictional, it was, in substance, a merits problem. That's because the decision was implicitly premised on the Court's substantive determination that the Legislature's interpretation of § 63 was within the realm of its lawful discretion to make rules related to its own proceedings.

To illustrate the point, imagine an otherwise identical fact pattern in which the Legislature has interpreted the phrase "a majority of each house" to mean that a bill may pass if zero legislators voted in its favor. If a plaintiff challenged the constitutionality of a bill "passed" without a

single affirmative vote of a legislator, we would hold the resulting statute unconstitutional. That's because "zero votes" is not a plausible reading of "a majority of [votes in] each house," and therefore does not fall within the Legislature's discretion to construe rules related to its own proceedings.

That hypothetical is extreme, of course, but I believe it crystallizes the distinction between jurisdiction and justiciability in this context. In both BJCCA and in the example imagined above, the issue boils down to whether the Legislature's interpretation of "a majority of each house" falls within the bounds of its discretion under the political question doctrine. And in making that threshold determination -- regardless of the outcome -- the Court is exercising subject-matter jurisdiction. Therefore, when we dispose of an appeal that presents a nonjusticiable political question, we do so on the merits.

Our better reasoned cases reflect that principle. A prime example is our recent decision in Clay County Commission v. Clay County Animal Shelter, Inc., 283 So. 3d 1218, 1228 (Ala. 2019). As in BJCCA, the issue in Clay County was whether the Legislature had complied with a constitutionally mandated procedure for passing a bill. Only this time,

the plaintiffs' challenge involved a requirement in § 73 that an appropriations bill pass "by a vote of two-thirds of all the members elected to each house." Ala. Const. 1901 (Off. Recomp.), Art. IV, § 73. The defendant conceded that the bill "did not receive the vote of two-thirds of all the members elected to each house," 283 So. 3d at 1221, but nonetheless argued that the validity of the resulting statute could not be challenged because, in the defendant's view, any dispute over whether a bill received the constitutionally mandated number of votes presented "a nonjusticiable political question," id. at 1225.

Our Court rejected that argument. We reasoned that since the language of § 73 was a "'clear constitutional mandate,'" there was no "'lack of judicially manageable standards'" that would trigger the political question doctrine and require the Court to "defer to the legislature's internal rules and procedures." Id. at 1226-27 (citations omitted). In doing so, we distinguished BJCCA, in which the procedural requirement of § 63 was susceptible to a range of interpretations and the Legislature's determination had fallen within that permissible range. In Clay County, by contrast, there was only one plausible interpretation of § 73, and the Legislature's actions did not comport with it. "[T]wo thirds

34

of all members elected to each house" meant exactly that: two-thirds of all members. And because it was undisputed that less than two-thirds of all the members elected to each house had voted in favor of the challenged statute, there was no way to square the Legislature's actions constitutionally.

What Clay County underscores is that while § 53 is a "textually demonstrable commitment" to the Legislature in determining the rules of its own proceedings, that power is necessarily limited by a range of permissible interpretations of the constitutional provision. And only a substantive rule -- in these cases, the political question doctrine -- can tell us whether the Legislature has exceeded its discretion. Since applying a substantive rule to the facts of a case necessarily entails exercising subject-matter jurisdiction, I believe that the proper disposition of a case that presents a political question is a dismissal on the merits.

The distinction between a dismissal for a lack of subject-matter jurisdiction and a dismissal on the merits has practical consequences for litigants. Because the former "does not operate as an adjudication on the merits," Ex parte Stewart, 985 So. 2d 404, 409 (Ala. 2007), res judicata is

35

no bar; the plaintiffs could file an identical lawsuit in federal court the day after the state suit was dismissed. By contrast, a Rule 12(b)(6), Ala. R. Civ. P., dismissal <u>does</u> operate as an adjudication on the merits under Rule 41(b), Ala. R. Civ. P., and would therefore preclude the plaintiffs from maintaining the suit in a different court. The upshot is that defendants in these cases may want to call courts' attention to this distinction in order to preempt repetitious litigation. And if litigants raise the issue in a future case, I would be willing to revisit <u>BJCCA</u> so that we can iron out its wrinkles and reconcile it with our better reasoned cases.

That said, the parties to this case have not asked us to depart from our reasoning in <u>BJCCA</u>. I therefore concur with the main opinion, which faithfully applies that precedent. <u>See</u> <u>Ex parte McKinney</u>, 87 So. 3d 502, 509 n.7 (Ala. 2011) (noting that "this Court has long recognized a disinclination to overrule existing caselaw in the absence of either a specific request to do so or an adequate argument asking that we do so").